**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| Crucible Industries LLC,[1] | ) | Case No. 24-31059 (WAK) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DECLARATION OF JOHN SHIESLEY IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS AND PURSUANT TO LOCAL RULE 2015-2

Pursuant to 28 U.S.C. § 1746, John Shiesley hereby declares and states as follows:

1.      I am the President of Crucible Industries LLC, the debtor and debtor in possession in the captioned chapter 11 case ("Crucible", or the "Debtor").  I was appointed to serve as President in June 2020, and prior to my appointment as President, I served as Vice President of Sales and Marketing.  In total, I have been employed by the Debtor for over 16 years.  Through this experience, and in my capacity as President of the Debtor, I am fully familiar with all aspects of the Debtor's business and operations.

2.      To enable the Debtor to minimize the adverse effects of the commencement of the chapter 11 case on its business, the Debtor has requested various types of relief in its "first day" pleadings and applications (each a "First Day Pleading").[2]  The First Day Pleadings seek relief intended to allow the Debtor to effectively transition into chapter 11 and minimize disruption of its business operations, thereby preserving and maximizing the value of the Debtor's estate.

3.      I submit this Declaration in support of the chapter 11 petition and the First Day Pleadings filed by the Debtor on December 12, 2024, and in compliance with Local Rule 2015-2.

---

[1] The last four digits of the Debtor's federal tax identification number are (9794).

[2] All capitalized terms used but not defined herein shall have the same meanings ascribed to them in the relevant First Day Pleadings.

4.      I am familiar with the contents of the First Day Pleadings (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful restructuring of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience and knowledge of the Debtor's operations and financial conditions, or are based upon knowledge of employees of the Debtor reporting to me derived in the course of their duties.  If I were called upon to testify, I could and would testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtor.

6.      Part I of this Declaration describes the Debtor's business and the circumstances surrounding the filing of its chapter 11 petition.  Part II of this Declaration sets forth the relevant facts in support of the various First Day Pleadings and other motions that will be filed by the Debtor on the Petition Date or shortly thereafter.

## PART I - BACKGROUND

7.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of New York (the "Court"), commencing the Debtor's chapter 11 case (this "Chapter 11 Case").

8.      The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for a

2

18631601.v10

trustee or examiner has been made in this Chapter 11 Case and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

## THE BUSINESS

9.      The Debtor, Crucible Industries LLC, is a Delaware limited liability company with corporate offices located at 812 Huron Road, Suite 880, Cleveland, Ohio 44115.

10.      The Debtor operates a manufacturing facility located at 575 State Fair Blvd. Solvay, NY 13209, which specializes in the production of patented, high-performance specialty "Crucible Particle Metallurgy" steel products.

### A.  Business History

11.      Crucible can trace its history of manufacturing specialty steel in the Syracuse area back to at least 1876.

12.      In 2009, after going through several transformations through mergers, consolidations, restructurings, and name changes, Crucible's predecessor company, Crucible Materials Corporation ("Old Crucible") filed for bankruptcy relief under chapter 11 of title 11 of the United States Code, with the United States Bankruptcy Court for the District of Delaware (the "Delaware Court").  *See In re Crucible Materials Corporation*, *et. al.*, Case No. 09-11582-MFW (D. Del. May 6, 2009).

13.      On September 25, 2009, the Delaware Court approved the sale of Old Crucible's Syracuse-based Specialty Metals Division to the Debtor.  *See id.* [Docket No. 438].  Since that time, Crucible has operated in its present location.

### B.  Business Operations

14.      The Debtor is engaged in the manufacturing and sale of specialty metal products for many different applications that offer superior metallurgical performance and that are capable

18631601.v10

of withstanding extreme environments.  Crucible's primary product lines include its signature "CPM" Powdered Metal Products, as well as stainless, alloy, automotive valve, and tool steels. In manufacturing its products, Crucible uses approximately 90% scrap and revert (internal scrap) metal which allows Crucible to provide exceptional value to its customers through the use of recycled industrial and consumer materials.  Crucible's products are sold to customers worldwide and are used in many different industries, including the automotive, power generation, aerospace, and other industrial machining industries.

15.    The Debtor's operations are located in Solvay, New York, a suburb of Syracuse New York, with a population of approximately 6,500 people.  The dedicated workforce is experienced and stable, with low turnover and many long-tenured employees.

16.    Crucible's workforce is comprised of approximately 170 full-time employees and 8 part-time employees.  Over 80% of the Debtor's employees are hourly wage earners, while the remaining approximately 20% are salaried personnel.  The full-time hourly employees are members of the local chapter of the United Steelworkers, AFL-CIO (the "Union").  The salaried employees are not part of the Union.  Crucible's current collective bargaining agreement (the "CBA") was set to expire on October 23, 2024, but has been extended by agreement with the Union through at least January 1, 2025.  The Debtor enjoys a good working relationship with the Union.

17.    Crucible leases its manufacturing facility from Syracuse Real Estate LLC ("SRE") pursuant to a lease agreement dated October 24, 2009.  SRE is affiliated with Crucible through common ownership.  Crucible operates several divisions and departments within its business at this facility, including scrap and alloy handling departments, turning, finishing, heat treating, metallurgical and mechanical testing labs and maintenance and support units.  The

4

facility also contains a variety of equipment used in the Debtor's day to day operations, including, among other things, a 40-ton Electric Arc Furnace with an Argon Oxygen Decarburization vessel, a 3-ton Induction Furnace, and various press and hand rolling mills ranging from 9 to 26 inches.

18.     The Debtor has significant long-term relationships with several key customers and is a sole or nearly sole source supplier of several specialty grades of steel products to its customers.

## C. Prepetition Debt Structure

19.     On December 8, 2009, Crucible executed and delivered a Credit and Security Agreement (together with all amendments, forbearance agreements and related transaction documents, the "KeyBank Credit Facility"), pursuant to which KeyBank National Association ("KeyBank") made available to Crucible, a revolving line of credit (the "KeyBank Revolver"). Repayment of the amounts loaned under the KeyBank Revolver is secured by a first position security interest and lien upon substantially all of Crucible's assets (the "Prepetition Collateral") and is backstopped, in part, by a limited guarantee of Jack Jankovic, James E. Phillips, and Ara Hacet.  As of the Petition Date, the Debtor estimates that the aggregate principal obligations owed to KeyBank under the KeyBank Facility total approximately $10,280,000.

20.     Also on December 8, 2009, the Debtor executed a Loan Agreement with the New York Urban Development Corporation d/b/a Empire State Development ("ESD"), (together with all amendments and related transaction documents, the "ESD Loan"), pursuant to which ESD provided an original principal amount of $5,330,000 in financing to the Debtor.  As of the Petition Date, the Debtor estimates that its aggregate principal obligations to the ESD under the ESD Loan total approximately $5,486,252.49.

18631601.v10

21.     On December 8, 2009, Crucible, ESD, and KeyBank entered into a Intercreditor Agreement (the "Intercreditor Agreement"), pursuant to which, among other things, the ESD Loan was subordinated to the KeyBank Facility, except that, ESD was permitted to maintain a first position security interest on certain property of Crucible.  However, based upon the Debtor's lien review, it appears that ESD failed to properly perfect its security interest in the Debtor's property.

22.     On January 31, 2017, the Debtor executed and delivered a Secured Demand Promissory Note (together with all related transaction documents, the "CX Note"), pursuant to which the Debtor's sole member CX Industries LLC ("CX") provided the Debtor with $3 million in financing.  Repayment of the amounts loaned under the CX Note is subject to a Subordination Agreement dated February 13, 2017, by and between the Debtor, CX, and KeyBank.  As of the Petition Date, the Debtor estimates that its aggregate principal obligations to CX under the CX Note total approximately $3,000,000.00.  The Debtor's lien review indicates that CX otherwise failed to perfect its security interest in the Debtor's property.

## CURRENT FINANCIAL CONDITION AND SALE EFFORTS

23.     Crucible has struggled financially in recent years due to a softening demand for steel products generally as manufacturing has slowed world-wide, as well as the challenges of price competition with larger and better resourced competitors, and other micro- and macro-economic factors.

24.     The Debtor's current assets include non-insider accounts receivable totaling approximately $3,800,000, inventory valued at approximately $17,700,000, and intellectual property with an unknown value.  The Debtor's liabilities include its indebtedness to KeyBank, ESD, and CX, together with trade payables totaling approximately $11,000,000.

18631601.v10

25.    In April 2024, Calibre Group LLC ("Calibre"), was retained to market the
Debtor's assets and business operations for sale.  Calibre contacted approximately 67 potential
financial and/or strategic purchasers, 18 of whom executed a non-disclosure agreement to
receive diligence information beyond what was contained in the initial "teaser."  The Debtor
made management presentations and hosted on-site visits for six interested parties, four of whom
(including the proposed Stalking Horse Purchaser) ultimately submitted a written indication of
interest in acquiring some or all of the Debtor's assets.  None of the potential purchasers
however, were willing to commit to an acquisition outside of a bankruptcy sale process.

26.    This case is being filed to pursue an expeditious sale of the Debtor's businesses
pursuant to section 363 of the Bankruptcy Code.  The Debtor has prepared a sale motion with a
proposed Asset Purchase Agreement and will file the motion on the Petition Date seeking to
(i) approve bidding procedures and (ii) sell all or substantially all of its assets pursuant to section
363 of the Bankruptcy Code.

## PART II - FIRST DAY PLEADINGS AND MOTIONS

**A. MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE UNITED STATES
BANKRUPTCY CODE, RULES 2002, 4001, 6003 AND 9014 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL
BANKRUPTCY RULE 4001-2: (A) AUTHORIZING THE DEBTOR to
OBTAIN SECURED POSTPETITION FINANCING AND USE
CASH COLLATERAL ON AN EMERGENCY BASIS, (B) GRANTING
ADEQUATE PROTECTION (C) SCHEDULING INTERIM AND FINAL
HEARINGS AND (D) GRANTING RELATED RELIEF (THE "DIP
FINANCING MOTION").**

27.    The Debtor seeks to obtain up to the lesser of the (a) the Borrowing Base (as
defined in the DIP Credit Agreement) and (b) $13.0 million in principal of post-petition
revolving credit debtor-in-possession financing and other financial accommodations (the "DIP
Facility"), as limited during the Interim Period by the terms of the Interim Order, and the

18631601.v10

revolving loans made under such facility, the "DIP Loans"), pursuant to and in accordance with the terms and conditions set forth in that certain *Super-priority Senior Secured Debtor-In-Possession Revolving Credit and Security Agreement* (as it may be amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Credit Agreement") with KeyBank.  In addition, the Debtor seeks authority to use proceeds if the DIP Facility and cash collateral and grant KeyBank adequate protection with respect to its prepetition liens in the form of replacement liens, super-priority claims adequate protection payments, and approval of sale milestone dates.

28.    It is my belief that the Debtor requires the use of cash collateral and the funds advanced under the DIP Facility to fund its day-to-day operations.  Simply put, the Debtor does not have sufficient liquidity to pay both its vendors for the materials necessary to continue operations and make adequate protection payments to the prepetition secured lenders.   Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with disastrous consequences for the Debtor, its estate, and creditors.

29.    Accordingly, the Debtor seeks authority, pursuant to section 363(c)(2) of the Bankruptcy Code, to use its prepetition cash collateral and pursuant to sections 364(c), (d) and (e) of the Bankruptcy Code, to obtain post-petition credit in the amount of up to $13,000,000 under the DIP Facility for use in the operation of its business and administration of the Chapter 11 Case.  The Debtor has not been able to obtain, in the ordinary course of its business, unsecured credit pursuant to section 364(c) sufficient to meet its operating needs.

30.    In sum, without immediate access to the cash collateral and DIP Facility proceeds, the Debtor faces a liquidity crisis that would threaten the viability of its business.  If cash is not available to maintain business-as-usual operations during the critical period immediately

18631601.v10

following commencement of this case, the Debtor will likely face a substantial, if not devastating, loss of customer support and other irreparable harm from a severe tightening or elimination of trade credit, delayed deliveries, loss of employees and employee morale and deteriorating relationships with suppliers and customers – all of which would adversely affect the value of the Debtor's business.  This potential loss of revenue would be extremely harmful at this critical juncture and could jeopardize the Debtor's ability to maximize the value of its assets in this Chapter 11 Case.  Thus, the Debtor's ability to remain viable operating entities and preserve value pending the orderly liquidations of its estate, depends upon obtaining the interim and final relief requested in the DIP Financing Motion.

### B.  MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) PAY PREPETITION COMPENSATION AND REIMBURSABLE EMPLOYEE BENEFITS, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS AND (C) CONTINUE EMPLOYEE BENEFIT PROGRAMS (THE "<u>EMPLOYEE WAGE MOTION</u>").

31.    To avoid the significant risk of resignations and of discontent or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtor be granted authorization requested in the Employee Wage Motion.  The Debtor requires the continued service of its employees in order to ensure that the continuity and quality of its business operations will not be threatened and so that the Debtor may continue, without unnecessary interruption, its efforts to achieve a successful outcome for the Chapter 11 Case.

32.    The Debtor employs approximately 170 full-time employees and 8 part-time employees.  Over 80% of all of the Debtor's employees are hourly wage earners, while the remaining approximately 20% are salaried personnel.  The full-time hourly employees are members of the local chapter of the United Steelworkers, AFL-CIO (the "<u>Union</u>").  The salaried employees are not part of the Union.

18631601.v10

33.    Based upon historical data, the average weekly payroll for the hourly employees is approximately $155,000.00, and the average bi-monthly payroll for the salaried personnel is $130,000.00.   The hourly employees are paid in arrears, and the salaried personnel are paid on the 1st and the 15th of the month in arrears.  The Debtor is current with respect to its payroll obligations.  As of the Petition Date, the accrued, unpaid payroll for the Debtor's employees is approximately $98,000.00, including the Debtor's portion of payroll taxes and employee benefits.

34.    No employee is currently, or anticipated to be, owed amounts that exceed the $15,150.00 cap on priority claim amounts set forth in section 507(a)(4) of the Bankruptcy Code.

35.    Accordingly, the Employee Wage Motion seeks authority to pay accrued but unpaid prepetition wages and salaries due to all of the Debtor's employees through the Petition Date.  The Debtor seeks to pay the wages and salaries for all of the Debtor's employees in the ordinary course when the first obligations come due, including obligations that are not yet due.

36.    In addition, in the ordinary course of its business, the Debtor provides benefits to its employees (collectively, the "Employee Benefits").  The Employee Benefits to employees include, without limitation, vacation leave, 401(k) retirement plans, health insurance, dental insurance, vision insurance, life insurance, workers' compensation and disability insurance.

37.    The Debtor routinely withholds from employee paychecks amounts that the Debtor is required to transmit to third parties.  Examples of such withholding include Social Security/FICA, federal, state, and local income taxes, garnishments, 401(k) deferments and premiums for health care, dental and vision insurance payments.  Such withheld funds, to the extent that they remain in the Debtor's possession, constitute monies held in trust and, therefore, are not property of the Debtor's bankruptcy estate.  I respectfully submit that the Debtor's

practice of directing such funds to the appropriate parties is in the ordinary course of business, and the Debtor is seeking authority to continue such practice.

38.     The obligations for which the Debtor seeks authorization to honor to its Employees were earned by individuals employed by the Debtor, and are for services rendered within one hundred and eighty (180) days before the commencement of the Debtor's case.  The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits discussed above.

39.     The relief requested pursuant to the Employee Wage Motion will not prejudice creditors, but rather will protect their interests.

40.     Finally, the Debtor further requests that this Court authorize the Bank to process, honor and pay all prepetition checks issued by, and fund transfer requests made from, the Debtor with respect to Employee wages and salaries and Employee Benefits that were not processed, honored or paid as of the Petition Date.

**C. MOTION FOR INTERIM AND FINAL ORDERS (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES TO AND/OR DISCRIMINATING AGAINST THE DEBTOR ON ACCOUNT OF PREPETITION AMOUNTS DUE, (B) DETERMINING THAT THE DEBTOR'S UTILITIES ARE ADEQUATELY ASSURED OF FUTURE PAYMENT, (C) AUTHORIZING THE DEBTOR TO PAY ADEQUATE ASSURANCE DEPOSITS AND (D) ESTABLISHING PROCEDURES FOR OBJECTING OR REQUESTING ADDITIONAL ASSURANCE OF PAYMENT (THE "<u>UTILITIES MOTION</u>").**

41.     Through the Utilities Motion, the Debtor seeks entry of interim and final orders (a) prohibiting utility companies (each a "<u>Utility Company</u>" and, collectively, the "<u>Utility Companies</u>") from altering, refusing or discontinuing services to and/or discriminating against the Debtor on account of prepetition amounts due, (b) determining that the Debtor's utility companies are adequately assured of future payment, (c) authorizing the Debtor to make

adequate assurance deposits and (d) establishing procedures for determining requests for additional assurance of payment.

42.     The Debtor currently uses water, electricity, natural gas, telecommunications, and other similar services provided by the Utility Companies. Uninterrupted service from the Utility Companies is essential to the Debtor's continued operation and successful restructuring. The Debtor could not maintain its facility or continue to operate its business in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtor.

43.     The Debtor intends to timely pay its postpetition obligations to the Utility Companies. The Debtor will make these payments with cash generated during this Chapter 11 Case and pursuant to orders of this Court authorizing the use of cash collateral and DIP Facility proceeds.

44.     Although the Debtor maintains that its ability to generate cash from operations during this Chapter 11 Case should be sufficient assurance of postpetition payments to Utility Companies, the Debtor proposes to provide a deposit equal to two weeks of utility service, calculated as a historical average over the past twelve (12) months (the "Adequate Assurance Deposit"), to any Utility Company who requests such a deposit in accordance with the provisions of the proposed interim order, provided that such requesting Utility Company does not already hold a deposit equal to or greater than the Adequate Assurance Deposit, and provided further that such Utility Company is not currently paid in advance for its services.

45.     The Debtor believes that most, if not all, of its Utility Companies have adequate assurance of payment even without the Adequate Assurance Deposit. When the Adequate Assurance Deposit is complemented by the Debtor's ability to pay through access to cash from

12

continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies and is thus clearly "adequate."

46.     Moreover, if a Utility Company disagrees with the Debtor's analysis, the Utility Company may file an Objection and negotiate a resolution thereof with the Debtor and, if necessary, seek Court intervention without jeopardizing the Debtor's continuing operations.

47.     Receiving the relief requested in the Utilities Motion is essential for the Debtor to be able to carry out its reorganization efforts.  If the Utilities Motion is not granted, the Debtor could be forced to address numerous requests by its Utility Companies in a disorganized manner at a critical point in this Chapter 11 Case.  Moreover, the Debtor could be blindsided by a Utility Company unilaterally deciding, on or after the thirtieth day following the Petition Date, that it is not adequately protected and therefore that it will discontinue service or make an exorbitant demand for payment to continue service.  Discontinuation of utility services, particularly water, gas, electricity and telecommunications, could essentially shut down the Debtor's operations, jeopardizing the Debtor's reorganization efforts.  Based on the foregoing, the Debtor submits that granting the relief requested in the Utilities Motion is both necessary and appropriate.

**D. MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO PAY PREPETITION TAXES AND REGULATORY FEES (THE "<u>TAX MOTION</u>").**

48.     The Debtor seeks authority to pay, in the ordinary course of the Debtor's business, prepetition sales, gross receipts, utility-users, federal excise and use, and certain other governmental taxes, including any amounts subsequently determined to be owing upon audit (collectively, the "<u>Taxes</u>"), regulatory fees, including, but not limited to, federal, state and local regulatory fees (the "<u>Regulatory Fees</u>"), and permit or other licensing fees (the "<u>Licensing Fees</u>," and together with the Taxes and Regulatory Fees, the "<u>Taxes and Fees</u>") to the respective

federal, state and local taxing authorities and other governmental agencies (each a "Taxing Authority" and collectively, the "Taxing Authorities").

49.    In the ordinary course of its business, the Debtor is required to collect and/or pay Taxes and Fees.  The Debtor must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Debtor conducts business.  The process by which the Debtor remits the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.[3]

50.    The Debtor further requests that all applicable banks and financial institutions be authorized and directed, when requested by the Debtor in its sole discretion, to receive, process, honor and pay any and all checks or electronic transfers drawn on the Debtor's accounts to pay all prepetition Taxes and Fees owed to the Taxing Authorities, whether those checks were presented prior to or after the Petition Date and to make other transfers provided that sufficient funds are available in the applicable accounts to make such payments.  To the extent the Taxing Authorities have not otherwise received payment for all prepetition Taxes and Fees owed, the Debtor seeks authorization to issue replacement checks, or to provide for other means of payment to the Taxing Authorities, to the extent necessary, to pay all outstanding Taxes and Fees owing for periods prior to the Petition Date.

51.    Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Debtor, its creditors and its estate.  Indeed, the Debtor's ability to manage and run its business operations with as little disruption as possible requires, in part, that the Debtor remains in good standing with the relevant Taxing Authorities.  For the foregoing reasons, I

---

[3] The Debtor is obligated under the terms of its lease with Syracuse Real Estate LLC to pay certain real property taxes, approximately $908,0000 of which are currently due and payable.  The Debtor is not seeking authority at this time to pay any prepetition amounts owed with respect to real property tax obligations under the lease.

18631601.v10

believe that the relief requested in the Tax motion is necessary and appropriate and is in the best

interests of the Debtor's estate, its creditors, and other parties in interest.

### E. MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING (A) MAINTENANCE OF EXISTING BANK ACCOUNTS, (B) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM AND (C) CONTINUED USE OF EXISTING BUSINESS FORMS (THE "CASH MANAGMENT MOTION").

52.     Prior to the Petition Date, the Debtor, in the ordinary course of its business,

maintained several bank accounts (collectively, the "Bank Accounts"), as follows:

a)      Cash Collateral Account.  The Debtor maintains a cash collateral account
(account No. XXXXXXXX7455, the "Cash Collateral Account") at
KeyBank National Association ("KeyBank").   Under the terms of that
certain Credit and Security Agreement entered into by and between the
Debtor and KeyBank dated December 8, 2009 (as amended and as the
same may from time to time be further amended, restated or otherwise
modified, the "Credit Agreement"), all collections from sales of inventory
or from account debtors are required to be deposited directly, on a daily
basis, and in any event no later than the first Business Day after the date of
receipt thereof, into the Cash Collateral Account.

b)      Operating Account.  The Debtor maintains an operating account (account
No. XXXXXXXX8537, the "Operating Account") at KeyBank.   The
Debtor uses the funds in the Operating Account to fund its day-to-day
operations and expenses.   Payments made by the Debtor via wire transfer
are made from the Operating Account. The Operating Account is also the
clearing account where daily funding from the Credit Agreement is
applied.

18631601.v10

c)    <u>Accounts Payable Account</u>.  The Debtor maintains an accounts payable account (account No. XXXXXXXX7894), the "<u>AP Account</u>") at KeyBank.  Payments made by the Debtor via check and automatic ACH payments, including payroll through ADP and certain lease payments, are made from the AP Account.

53.    The Bank Accounts and the Debtor's practices and procedures with respect to the receiving customer payments, making disbursements and making payroll constitute the Debtor's cash management system (the "<u>Cash Management System</u>").  The Cash Management System enables the Debtor to monitor collection and disbursement of funds and maintain control over the administration of its bank accounts, all of which facilitate the effective collection, disbursement and movement of cash.

54.    As of the Petition Date, the Debtor will instruct the KeyBank to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of those checks relating to certain prepetition debts that the Debtor is seeking the authority to pay pursuant to several other motions filed contemporaneously herewith.

55.    Pursuant to the standard chapter 11 operating practice in this jurisdiction, the Debtor is required, among other things, to open new bank accounts upon the filing of the bankruptcy petitions and are further required to designate such accounts as "Debtor in Possession" on the respective account signature cards.

56.    The Debtor's existing Cash Management System is essential to the ordinary coordination of the Debtor's business.  The Debtor submits that the cost and expense of changing the Bank Accounts and creating a new cash management system would not only force the Debtor

16

to incur significant and unnecessary costs and expenses, but would impair the operation of the Debtor's business.

57.     Indeed, forcing the Debtor to employ a new cash management system could cause confusion, diminish the prospects for a successful reorganization, disrupt payroll and introduce inefficiency at a time when efficiency is most critical, and place a strain on the Debtor's relationships with customers and vendors.  Naturally, these relationships must be maintained if the Debtor is to be given the opportunity to operate successfully.  Asking the Debtor's customers to remit payments to new and different accounts will result in a slowdown in the Debtor's collection of receipts just at the time when prompt collection of much-needed cash is most critical.

58.     Further, the preservation of the Bank Accounts will not adversely impact any of the Debtor's creditors.  The Debtor will work with the Office of the United States Trustee to ensure that the Bank at which the Debtor's operating, payroll and credit card accounts are located are designated as Authorized Depositories.

59.     The Debtor seeks to prohibit and enjoin KeyBank from honoring all prepetition checks, except as expressly set forth in the Cash Management Motion.

60.     The Debtor also requests permission to use its existing business forms and stationery without alteration or change.  The Debtor does not print its own business forms and stationery.  Thus, substantial time and expense would be required if the Debtor is required to print new business forms and stationery merely to indicate "debtor in possession".  The Debtor also intends to execute new signature cards with respect to its Bank Accounts to indicate "debtor in possession," and will also stamp all checks "DIP" or "Debtor in Possession" post-petition.

18631601.v10

61.     Based upon all of the foregoing, the Debtor submits that sufficient cause exists to allow the Debtor to maintain its existing Bank Accounts, Cash Management System and business forms, and respectfully requests that it be authorized to continue using its current Cash Management System and business forms during the post-petition period.

**F.  MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) HONOR PREPETITION INSURANCE PREMIUM FINANCING AGREEMENT AND (B) ENTER INTO NEW PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS (THE "INSURANCE PREMIUM FINANCING MOTION").**

62.     By the Insurance Premium Financing Motion, the Debtor seeks authority, but not direction, to (a) honor its prepetition insurance premium financing agreements and (b) enter into new premium finance agreements in the ordinary course of business.

63.     In the ordinary course of the Debtor's business, in the ordinary course of the Debtor's business, it maintains various liability, property, and other insurance policies (the "Insurance Policies").  The Insurance Policies include coverage for, among other things, employees' group benefit health plans, auto, casualty, liability, financial and professional liability, fire, property, travel, cyber, workers compensation insurance.  The Insurance Policies are essential to the preservation of the Debtor's business, properties, and assets and, in many cases, such coverages are required by various regulations, laws and contracts that govern the Debtor's commercial activity.

64.     The aggregate cost of the annual premiums for the Debtor's Insurance Policies is approximately $1,781,000.  It is not always economically advantageous for the Debtor to pay the premiums on all of the Insurance Policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtor's business, the Debtor finances the premiums on certain Insurance Policies by entering into premium finance agreements with premium finance companies.

18631601.v10

65.     Currently, the Debtor finances its insurance premiums for excess property coverage pursuant to a premium financing agreement (the "Property Agreement") with First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A. ("First Insurance"). Pursuant to the terms of the Property Agreement, prior to the Petition Date, the Debtor made a cash down payment to First Insurance in the amount of $295,629.66 and financed the remaining $886,889.00 of premiums covered by the Property Agreement.  In exchange for these financing terms, the Debtor agreed to pay ten monthly installment payments in the amount of $91,803.34 including a total finance charge of $31,144.40, representing an annual interest rate of 7.590%.  In addition, the Debtor granted First Insurance a security interest in financed policies and any additional premium required under the financed policies, including (a) all returned or unearned premiums, (b) all additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums.

66.     The Debtor also finances certain cyber liability and commercial package coverage premiums pursuant to a financing agreement ("Package Agreement", together with the Property Agreement, the "Premium Financing Agreements") with First Insurance.  Pursuant to the terms of the Package Agreement, prior to the Petition Date, the Debtor made a cash down payment to First Insurance in the amount of $5,384.75 and financed the remaining $16,154.25 of premiums covered by the Package Agreement.  In exchange for these financing terms, the Debtor agreed to pay ten monthly installment payments in the amount of $1,672.15 including a total finance charge of $567.25, representing an annual interest rate of 7.590%.  In addition, the Debtor granted First Insurance a security interest in financed policies and any additional premium required under the financed policies, including (a) all returned or unearned premiums, (b) all

18631601.v10

additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums.

67.      If the Debtor is not able to pay its financing obligations, First Insurance may seek relief from the automatic stay to terminate the financed Insurance Policies in order to recoup its losses.  The Debtor would then be required to obtain replacement insurance on an expedited basis and at a tremendous cost to the Debtor's estate.  If the Debtor were required to obtain replacement insurance and pay a lump-sum premium in advance, this payment would likely be greater than what the Debtor currently pays and could cause cash flow difficulties for the Debtor. Even if First Insurance is not permitted to terminate the insurance policy, any interruption of payment could have a severe, adverse effect on the Debtor's ability to obtain a new policy or finance premiums in the future.

68.      In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtor's cash flow and estate by financing the insurance premiums, the Debtor believes it is in the best interests of its estate to authorize the Debtor to honor its financing obligations.   Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtor's reorganization efforts.

69.      In addition, because the Finance Agreement and the Insurance Policies may expire during the course of this Chapter 11 Case, the Debtor seeks authority to renew the Finance Agreement and enter into other similar agreements for its Insurance Policies in the ordinary course of its business, without further Court approval.  The Debtor will need to continue its insurance coverage throughout the entire duration of this Chapter 11 Case.   The Debtor

18631601.v10

respectfully submits that renewal of the Finance Agreement falls squarely within the ordinary course of its business, and, but for the constraints of section 364 of the Bankruptcy Code, the Debtor would not need the Court's prior approval to renew the Premium Financing Agreements. To reduce the administrative burden, as well as the expense of operating as a debtor in possession, the Debtor seeks the Court's authority now to renew the Premium Financing Agreements or enter into new insurance financing agreements for its Insurance Policies, if and when necessary.

70.     Accordingly, the Debtor respectfully requests that the Court grant the Insurance Premium Financing Motion.

### G.  MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULES 1007(c) AND 9006(b)(1) EXTENDING TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES, SCHEDULES OF CURRENT INCOME AND EXPENDITURES, SCHEDULES OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND STATEMENTS OF FINANCIAL AFFAIRS (THE "SCHEDULES EXTENSION MOTION").

71.     The Debtor seeks entry of an order extending the time for the Debtor to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements") to the date which is forty-five (45) days following the Petition Date, without prejudice to Crucible's ability to request additional time should it become necessary.

72.     Crucible anticipates that there will be more than 250 creditors and interested parties involved in this Chapter 11 Case, primarily pertaining to vendor trade accounts. Thus, preparing the Schedules and Statements accurately and with sufficient detail and adherence to accounting principles requires significant attention from Crucible personnel, counsel, and

18631601.v10

advisors.    Crucible personnel will devote significant time to ensuring accurate cutoff so that liability is properly reported as of the Petition Date.

73.    In addition to the reasons set forth above, Crucible respectfully submits that the complexity of its operations, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational and mission stabilization matters that Crucible personnel must address in the early days of this Chapter 11 Case, the considerable demands and pressure incident to the commencement of this Chapter 11 Case, and the fact that certain prepetition invoices may not be received or entered into Crucible's accounting system prior to the Petition Date provide ample cause justifying the requested extension of the deadline to file the Schedules and Statements.

74.    Consequently, it is in the best interests of the Debtor, its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Debtor with a total of 45 days from the Petition Date to file the Schedules and Statements.

**H. MOTION FOR ENTRY OF ORDERS: (A)(I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE PROPOSED SALE, IN ONE OR MORE LOTS, OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (IV) APPROVING STALKING HORSE ASSET PURCHASE AGREEMENT; (B)(I) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (II) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF (THE "SALE MOTION").**

75.    The Debtor filed the Sale Motion pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, seeking among other things, entry of orders: (a)(i) approving bidding procedures in connection with the

18631601.v10

sale, in one or more lots, of substantially all of the Debtor's assets (the "Purchased Assets"), (ii) scheduling an auction and a hearing to consider the sale, (iii) approving the form and manner of notice thereof, and (iv) approving the terms of the Stalking Horse APA (as defined in the Sale Motion); (b)(i) authorizing and approving the sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests, and (ii) authorizing and approving the assumption and assignment of executory contracts and unexpired leases; and (c) granting related relief.

76.    The Debtor has struggled financially in recent years due to a softening demand for steel products generally as manufacturing has slowed world-wide, as well as the challenges of price competition with larger and better resourced competitors, and other micro- and macro-economic factors.

77.    As a result of its prepetition marketing process described above, the Debtor has selected EraSteel Inc. as its proposed stalking horse purchaser ("EraSteel", or the "Stalking Horse Purchaser") and has entered into an asset purchase agreement with EraSteel (the "Stalking Horse APA").   The Stalking Horse APA provides that the Stalking Horse Purchaser will purchase all or substantially all of the Debtor's assets associated with its Crucible Particle Metallurgy ("CPM") line of business, together with the Debtor's intellectual property rights, accounts receivable, and inventory (the "Lot 1 Assets") in exchange for a cash purchase price of approximately $17,348,654.25, subject to certain adjustments and credits which relate primarily to changes in inventory and accounts receivable, as well as certain shared transaction expenses and inventory relocation costs (the "Purchase Price").

78.    To obtain maximum value, the Debtor proposes to hold an auction process with the Stalking Horse APA serving as a basis for competitive and/or complimentary bids.   In connection with the auction process, the Debtor has agreed to grant the Stalking Horse Purchaser

certain bidding protections, including a break-up fee of $520,460.00 (the "Break-Up Expense Fee"). If no other bids are received for the Lot 1 Assets that are higher or otherwise better than the transaction set forth in the Stalking Horse APA, no Break-Up Expense Fee will be payable (absent a breach by the Debtor) and the Debtor will ask the Court to approve the sale of the Lot 1 Assets to the Stalking Horse Purchaser pursuant to the terms of the Stalking Horse APA.

79.     In addition to the Lot 1 Assets contemplated to be sold pursuant to the Stalking Horse Purchaser, the Debtor also proposes to solicit bids for those residual assets which are excluded from the Stalking Horse APA (collectively, the "Lot 2 Assets") and any combined bids for both Lot 1 Assets and Lot 2 Assets.

80.     The Sale Motion also seeks approval of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets (collectively, the "Bidding Procedures").

81.     The Debtor believes the proposed Bidding Procedures will maximize the realizable value of the Purchased Assets for the benefit of the Debtor's estate, creditors and other interested parties. The Bidding Procedures contemplate an auction process pursuant to which the Stalking Horse APA will be subject to higher or otherwise better offers, as well as the solicitation of offers for any Lot 2 Assets not proposed to be sold to the Stalking Horse Purchaser and combined offers for both Lot 1 Assets and Lot 2 Assets.

82.     Accordingly, the Debtor respectfully requests that the Court approve the Sale Motion.

## I.  ADDITIONAL MOTIONS AND APPLICATIONS

83.     In addition to the First Day Motions discussed above, the Debtor anticipates filing several additional motions and applications in short order, including (i) a motion to

18631601.v10

approve a Key Employee Retention Plan for certain Key Employees, (ii) an application to retain Bond, Schoeneck & King, PLLC as counsel for the Debtor, (iii) an application to retain Calibre Group LLC as the Debtor's sales and marketing agent, and (iv) an application to retain Stretto as the Debtor's noticing agent.

## CONCLUSION

84.    For the reasons set forth herein, and in the First Day Motions, the Debtor respectfully requests that the Court grant the relief requested in the First Day Motions and provide such other and further relief as the Court may deem just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 12, 2024

_____ /s/ John Shiesley _____
John Shiesley, President
Crucible Industries LLC

18631601.v10