# EXHIBIT A

(Asset Purchase Agreement)

**ASSET PURCHASE AGREEMENT**

between

**CRUCIBLE INDUSTRIES LLC,**

and

**LAUTER METAL TECHNOLOGIES LLC**

dated as of

February 27, 2025

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as February 27, 2025 is entered into between CRUCIBLE INDUSTRIES LLC, a limited liability company organized under the laws of Delaware ("**Seller**"), and LAUTER METAL TECHNOLOGIES LLC, a limited liability company organized under the laws of New York ("**Buyer**").

## RECITALS

WHEREAS, Seller intends to file a voluntary petition under chapter 11 (the "**Bankruptcy Case**") of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**");

WHEREAS, Seller is engaged in the business of producing Crucible Particle Metallurgy powdered steel products (the "**CPM Business**") and other specialty steel products at their steelmaking plant in Syracuse, New York (the "**Remaining Business**") and collectively with the CPM Business, the "**Business**"); and

WHEREAS, Buyer desires to keep the certain of the Remaining Business in New York State, revitalize its operations and hire certain of the existing workforce needed for the Remaining Business; and

WHEREAS, Buyer desires to purchase from the Seller and the Seller desires to sell to Buyer the Purchased Assets, and Buyer has agreed to assume the Assumed Liabilities all upon the terms and subject to the conditions set forth herein and with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Action**" means any action, suit, claim, cause of action, inquiry, complaint, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, at law or in equity, or any arbitration.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

21282960

"**Allocation Schedule**" has the meaning set forth in Section 2.07.

"**Alternate Transaction**" means a transaction or series of related transactions pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction, including pursuant to a stand-alone plan of reorganization or refinancing any of the Purchased Assets other than the sale of the Lot 1 Assets.

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 3.02(a)(iii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Bidding Procedures Order**" means an order entered by the Bankruptcy Court (i) approving the terms of this Agreement and (ii) establishing customary bidding procedures to determine the highest or otherwise best offer for the Purchased Assets.

"**Bankruptcy Sale Order**" means an order entered by the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which order shall be reasonably satisfactory to Seller and Buyer.

"**Bidding Procedures**" means the bidding procedures attached to, and approved by, the Bankruptcy Bidding Procedures Order.

"**Bill of Sale**" has the meaning set forth in Section 3.02(a)(i).

"**Books and Records**" has the meaning set forth in Section 2.01(a).

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in Section 7.03(d).

"**Calibre**" means Calibre Group, LLC.

"**Closing**" has the meaning set forth in Section 3.01.

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Confidentiality Agreement**" means the Confidentiality Agreement, dated as of December 17, 2024, between RC Holdings and Calibre, for the benefit of Seller.

"**Contracts**" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements.

"**Customer Lists and Relationships**" has the meaning set forth in Section 2.01(h).

"**Data Room**" means the electronic documentation site established by Calibre Group LLC.

"**Deposit**" has the meaning set forth in Section 2.06.

"**Deposit Escrow Agreement**" has the meaning set forth in Section 2.06.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Employees**" means those Persons employed by Seller who worked exclusively for the Business immediately prior to the Closing.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance, title defect or restriction of any kind.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence of, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient or indoor air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the

Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

**"Environmental Permit"** means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law, including, without limitation the Title V Permit – Division of Air Resources, Permit ID:7-3132-0007/00028; Facility DEC ID: 7313200007 issued to Seller for SIC Code 3312- Blast Furnaces and Steel Mills, State Pollutant Discharge Elimination System (SPDES) Discharge Permit, SPDES Number NY0000825, DEC Dumber 7-3132-00007/00005, Industrial Wastewater Discharge Permit #48.

"**Equipment**" shall mean the used equipment and machinery used in the operation of the Business.

"**Escrow Agent**" shall mean Bond, Schoeneck & King, PLLC.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls and per- and poly-fluoroalkyl substances (PFAS) and other emerging contaminants.

"**Hired Employee**" has the meaning set forth in Section 10.01.

"**Intellectual Property**" means all worldwide intellectual property and rights wholly owned, assigned or registered to Seller including any of the following: (a) patents, patent applications, statutory invention registrations and any rights arising thereunder; (b) trademarks, trademark applications, service marks, service mark applications, URLs, domain names, trade dress, and logos, including all common law rights therein and all goodwill associated therewith; (c) copyrights, whether or not registered, and copyright applications; (d) trade secrets and confidential information; (e) all technical information, methods, techniques, formulas, processes, designs, drawings, schematics, specifications, data, and other confidential and proprietary information relating to the Seller's Business, including those used in the development, manufacturing, and distribution of the Seller's products and services; and (f) any other intellectual property or proprietary rights held by the Seller that contribute to its Business and business operations, market position, or competitive advantage.

"**Intellectual Property Assignments**" has the meaning set forth in Section 3.02(a)(iii).

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means with respect to Seller, the actual knowledge after reasonable inquiry of John Shiesley and Michael Freer.

"**Landlord**" means Syracuse Real Estate LLC, a Delaware limited liability company.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Licensed Intellectual Property**" has the meaning set forth in Section 4.10.

"**Lot 1 Assets**" means those assets listed as Purchased Assets in that certain Asset Purchase Agreement dated December 11, 2024 between Seller and ERA Steel Inc. (the "**Stalking Horse APA**").

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to the Purchased Assets, or (b) the ability of Seller to consummate the transactions contemplated hereby; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller and the Business; (ix) any natural or man-made disaster or acts of God; (x) any epidemics,

6

pandemics, disease outbreaks, or other public health emergencies; or (xi) the filing or pendency of the Bankruptcy Case.

"**Material Contracts**" has the meaning set forth in Section 4.04.

"**Order**" shall mean any order, judgment, injunction, award, decree or writ of any Governmental Authority.

"**Owned Intellectual Property**" all Intellectual Property used, or held for use in connection with the operations of the Business that is owned by Seller.

"**Periodic Taxes**" shall mean ad valorem, property, excise or similar Taxes based upon operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, income, franchise and similar Taxes and Transfer Taxes.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and consents obtained or required to be obtained from Governmental Authorities, including without limitation Environmental Permits and compliance certifications including, without limitation AS9100D/EN 9100:2016 / JISQ 9100:2016, ISO 9001:2015 – ANSI/ISO/ASQ Q9001-2015, Pressure Equipment Directive (PED) Annex I, Paragraph 4.3 of 2014/68/EU or 97/23/EC 7/2 and ASME section III sub-section NCA-3800.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Purchased Intellectual Property**" means, to the extent not included in the Lot 1 Assets, all Owned Intellectual Property, Seller's right to the Licensed Intellectual Property and all other Intellectual Property rights (whether or not registered) that relate to the Business or which are manufactured, used, offered for sale, sold, published, performed or exploited in the operation of the Business.

"**Proration Period**" means any Tax period beginning on or before and ending after the Closing Date.

"**Purchase Price**" has the meaning set forth in Section 2.05.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Purchased Asset Location**" has the meaning set forth in Section 2.01(a).

"**Real Estate Purchase And Sale Agreement**" has the meaning set forth in Section 6.14.

"**Real Estate Seller**" means Syracuse Real Estate LLC.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient or indoor air, surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Schedule Supplement**" has the meaning set forth in Section 6.03.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in Section 7.02(e).

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Tax Proceeding**" has the meaning set forth in Section 6.11.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Tax**" or "**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Intellectual Property Assignments, the Assignment and Assumption Agreement, the Real Estate Purchase and Sale Agreement, and the other agreements, instruments and documents required to be delivered at the Closing.

"**Transfer Taxes**" has the meaning set forth in Section 6.11.

"**WARN Act**" means the Federal Worker Adjustment and Retraining Notification Act, 21 U.S.C. §2101 et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01 Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (which relate to, or are used or held for use in connection with, the Business other than the Excluded Assets (collectively, the "**Purchased Assets**"), including the following:

8

(a)     All Equipment including that listed on Section 2.01(a) of the Disclosure Schedule (the "**Equipment Schedule**") whether the item description be by name, number, location, asset category description, asset type or document number id, and which includes with respect to each item listed the fixed asset, operational infrastructure, related production equipment and vessels, purchase receipts, drawings, manuals, pre-paid expenses, and/or supplies, located or contained within, on or around such asset, related spare parts, tooling and machinery, together with all other furniture and fixtures, tools, office equipment, supplies, computers, telephones and any other tangible personal property that is used in or related to the Business (collectively, the "**Tangible Personal Property**") located at 575 State Fair Blvd., Solvay, New York 13209 (the "**Purchased Asset Location**");

(b)     All software used in connection with the Purchased Assets, to the extent not included in the Lot 1 Assets, if any;

(c)     All packaging, spare parts, supplies and any other inventory of the Business;

(d)     All of Seller's right, title and interest to the Purchased Intellectual Property, if any;

(e)     all deposits (including security deposits for rent, electricity, telephone or otherwise) and prepaid or deferred charges and expenses of Seller relating to Purchased Assets;

(f)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(g)     copies or originals of all books and records, including purchasing records, books of account, ledgers and general, financial and accounting records that relate to the Purchased Assets, other than books and records described in Section 2.02(d) ("**Books and Records**");

(h)     all records, databases, and information relating to customers, clients, distributors, and partners, including contact details, purchase histories, and engagement records, along with any associated goodwill, to maintain ongoing business relationships and customer loyalty related to the Remaining Business ("**Customer Lists and Relationships**");

(i)     the Executory Contracts or Unexpired Leases (collectively, the "Executory Contracts and Unexpired Leases") set forth on Section 2.01(g) of the Disclosure Schedules at the cure amounts ("**Cure Amounts**") set forth on Exhibit A To Notice of Assumption, Assignment and/ or Transfer filed in connection with the Bankruptcy Case with United States Bankruptcy Court for the Northern District of New York on January 8, 2025 (the "**Assumed Contracts**");

**(j)** to the extent transferrable, all Permits including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets; and

**(k)** all goodwill associated with any of the assets described in the foregoing clauses.

**Section 2.02 Excluded Assets.** Other than the Purchased Assets subject to Section 2.01, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "**Excluded Assets**"). Excluded Assets include the following assets and properties of Seller:

**(a)** all Lot 1 Assets;

**(b)** all cash and cash equivalents, bank accounts and securities of Seller;

**(c)** all Contracts other than the Assumed Contracts (the "**Excluded Contracts**");

**(d)** the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, other than personnel files of Transferred Employees and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

**(e)** all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

**(f)** all benefit plans and trusts or other assets attributable thereto;

**(g)** all Tax assets (including duty and Tax refunds and prepayments) of Seller;

**(h)** all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise;

**(i)** the rights which accrue or will accrue to Seller under the Transaction Documents.

**Section 2.03 Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due (i) the Cure Amounts under the Assumed Contracts, and (ii) the Transfer Taxes associated with the transfer of the Purchased Assets under this Agreement (collectively, the "**Assumed Liabilities**").

**Section 2.04 Excluded Liabilities.** Notwithstanding anything to the contrary in this Agreement or any other Transaction Document, the Parties expressly acknowledge and agree that Buyer shall not assume or in any manner whatsoever be liable or responsible for any

10

liabilities or obligations of Seller or any predecessor, successor or Affiliate of Seller, of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non- contingent, liquidated or unliquidated, or otherwise, existing before or on the Closing Date or arising thereafter (collectively, the "**Liabilities**"), other than the Assumed Liabilities. All of the Liabilities of Seller or of any predecessor, successor or Affiliate of Seller not specifically and expressly assumed by Buyer pursuant to Section 2.03 shall be referred to herein collectively as the "**Excluded Liabilities**." Without limiting the generality of the foregoing, Excluded Liabilities shall include the following:

      **(a)**     any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

      **(b)**     any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; or (ii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

      **(c)**     any Liabilities relating to or arising out of the Excluded Assets;

      **(d)**     any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

      **(e)**     any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

      **(f)**     any Liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

      **(g)**     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

      **(h)**     any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

11

**(i)** any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same;

**(j)** any Liabilities under the Excluded Contracts or any Legal Proceedings; and

**(k)** any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 2.05    Purchase Price.** The aggregate purchase price for the Purchased Assets (the "**Purchase Price**") shall be calculated by taking the sum of:

    **(a)**    $1,400,000.00;

    **(b)**    plus the assumption of the Assumed Liabilities.

    The Purchase Price shall be paid by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer.

**Section 2.06    Deposit.** Simultaneously with the execution and delivery by the parties of this Agreement, Seller and Buyer shall execute an escrow agreement, substantially in the form of **Exhibit A** hereto (with such changes as may be reasonably required by the Escrow Agent, the "**Deposit Escrow Agreement**"), with the Escrow Agent, pursuant to which Buyer shall deposit with the Escrow Agent an amount equal to $140,000 (the "**Deposit**") by wire transfer of immediately available funds. The Deposit shall be applied to the Purchase Price at Closing, or in case of a Termination, pursuant to Section 9.02, each in accordance with this Agreement and the Deposit Escrow Agreement.

**Section 2.07    Allocation of Purchase Price.** Prior to the Closing, Buyer and Seller shall reasonably agree on a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Tax Code. The Allocation Schedule shall be used for all purposes, including without limitation Tax reporting purposes. Seller and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax Returns in accordance with the Allocation Schedule. The Parties covenant and agree that (a) neither Buyer nor Seller shall assert that this Section 2.07 was not separately bargained for at arm's length and in good faith, and (b) neither Buyer nor Seller will take any position before any Governmental Authority, in any judicial proceeding, or in any Tax Return that is in any way inconsistent with such Allocation Schedule unless otherwise required by Law.

**Section 2.08    Withholding.** Buyer shall be entitled to deduct and withhold from any consideration otherwise payable or deliverable to Seller such amounts as may be required to be deducted or withheld therefrom under the Code, under any Tax law or pursuant to any other applicable Law. Buyer shall provide Seller with written notice of its intent to withhold at least three (3) days prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to

21282960

mitigate or eliminate any such withholding to the maximum extent permitted by Law. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes as having been paid to the Person to whom such amounts would otherwise have been paid absent such deduction or withholding.

## ARTICLE III
## CLOSING

**Section 3.01  Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely by exchange of documents and signatures (or their electronic counterparts), within five(5) Business Days after all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

### Section 3.02  Closing Deliverables.

(a)  At the Closing, Seller shall deliver to Buyer the following:

(i)  A certified copy of the Bankruptcy Sale Order;

(ii)  a bill of sale in the form of **Exhibit B** hereto (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(iii)  such trademark assignments, copyright assignments, patent assignments, and other Intellectual Property, assignments as are reasonably necessary and desirable to assign and transfer good and marketable title to the Intellectual Property included in the Purchased Assets to Buyer, each duly executed by Seller (collectively, the "**Intellectual Property Assignments**");

(iv)  an assignment and assumption agreement in the form of **Exhibit C** hereto (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(v)  the Seller Closing Certificate;

(vi)  [Intentionally omitted]

(vii)  the Real Estate Purchase and Sale Agreement, duly executed by Seller;

(viii)  a validly executed IRS Form W-9 of Seller; and

(ix)     such other customary instruments of transfer, assumption, filings, consents, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

**(b)**     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Purchase Price (adjusted for the Deposit, which will be released by the escrow agent at Closing pursuant to the Deposit Escrow Agreement) by wire transfer of immediately available funds to one or more accounts designated in writing by Seller to Buyer;

(ii)     the Assignment and Assumption Agreement duly executed by Buyer;

(iii)     the Buyer Closing Certificate;

(iv)     the Real Estate Purchase and Sale Agreement, duly executed by RAC Holdings LLC;

(v)     the certificates of an authorized person, the Secretary or Assistant Secretary of Buyer required by Section 7.03(e); and

(vi)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer, that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Qualification of Seller.** Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

**Section 4.02   Authority of Seller.** Subject to the entry of the Bankruptcy Sale Order, Seller has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Bankruptcy Sale Order, the execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its

21282960

obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on behalf of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer and subject to the entry of the Bankruptcy Sale Order) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto and subject to the entry of the Bankruptcy Sale Order), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.03 No Conflicts; Consents.** Subject to the entry of the Bankruptcy Sale Order, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of incorporation or by-laws of Seller; or (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets. Subject to the entry of the Bankruptcy Sale Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required as set forth in Section 4.03 of the Disclosure Schedules and except where the failure to make or obtain such consent, approval, Permit, Governmental Order, declaration, filing, or notice would not have a Material Adverse Effect.

**Section 4.04 Material Contracts.** Seller has delivered or made available to the Purchaser in the Data Room true and complete copies of each written material Contract related to the Business (collectively, the "**Material Contracts**").

**Section 4.05 Title to Purchased Assets.** Subject to the entry of the Bankruptcy Sale Order, Buyer will be vested with good and valid title to the Purchased Assets, including the Intellectual Property, free and clear of Encumbrances.

**Section 4.06 Reserved.**

**Section 4.07 Legal Proceedings.** Except for the Bankruptcy Case and as set forth in Section 4.07 of the Disclosure Schedules there are no actions, suits, claims, investigations or other legal proceedings (collectively, "**Legal Proceedings**") pending or, to Seller's Knowledge, threatened against or by Seller relating to or affecting the Business, the Purchased Assets or the

15

Assumed Liabilities, which if determined adversely to Seller would result in a Material Adverse Effect.

### Section 4.08 Compliance With Laws; Permits.

**(a)** Except as set forth in Section 4.08(a) of the Disclosure Schedules, to Seller's Knowledge, Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, except where the failure to be in compliance would not have a Material Adverse Effect.

**(b)** Except as set forth in Section 4.08(b) of the Disclosure Schedules, all Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect, and no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit.

**Section 4.09 Taxes.** Except as set forth in Section 4.09 of the Disclosure Schedules, or as would not have a Material Adverse Effect, Seller has filed (taking into account any valid extensions) all material Tax Returns with respect to the Purchased Assets and the Business required to be filed by Seller and has or will have paid all Taxes shown thereon as owing. Seller is not currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business.

### Section 4.10 Intellectual Property.

**(a)** Section 4.10(a) of the Disclosure Schedules sets forth a true and complete list of (i) all registered Intellectual Property used, or held for use in connection with the operations of the CPM Business that is owned by Seller; and (ii) all Intellectual Property exclusively used in connection with the Business that Seller is licensed or otherwise permitted to use by other Persons, other than commercially available off- the-shelf software.

**(b)** Except as set forth on Section 4.10(b) of the Disclosure Schedules.

(i) Seller owns all Owned Intellectual Property listed on Section 4.10(a) of the Disclosure Schedules and has valid rights in and to all Owned Intellectual Property, in each case, free and clear of all Encumbrances.

(ii) No Owned Intellectual Property is the subject of any material ownership, validity, use or enforceability challenge or subject to any Order.

(iii) Seller is neither currently violating nor has, in the past five (5) years, violated any third Person's intellectual property rights and there are no pending or threatened in writing Actions with respect to such conduct against Seller.

16

(iv) To Seller's Knowledge, no Person is infringing, diluting, misappropriating or otherwise violating any material Owned Intellectual Property.

**Section 4.11 Employees; Employee Benefits.**

**(a)** Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation or benefits due, to any employee of the Business for which Buyer may choose to offer employment ("**Transferred Employee**"); (ii) result in the acceleration of the time of payment or vesting of any such compensation or benefits of any Transferred Employee; or (iii) result in the payment of any amount that would, individually or in combination with any other such payment, be an "excess parachute payment" within the meaning of Section 280G of the Code.

**Section 4.12 Reserved.**

**Section 4.13 Reserved.**

**Section 4.14 Brokers.** Except for Calibre, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of a Seller.

**Section 4.15 Insurance.** Section 4.15 of the Disclosure Schedule sets forth all insurance policies covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).

**Section 4.16 No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE IV (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of a Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives (including any information, documents or material made available to Buyer in the Data Room, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law. NO WARRANTIES SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01 Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of New York.

**Section 5.02 Authority of Buyer.** Buyer has all necessary limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.03 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of formation or operating agreement of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) except as set forth in Section 5.03 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice or obtain consent would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required under as set forth in Section 5.03 of the Disclosure Schedules and except where the failure to make or obtain such consents, approvals, Permits, Governmental Orders, declarations, filings, or notices would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and thereby.

**Section 5.04 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated

18

by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05  Sufficiency of Funds.** Buyer or Optitorque Technologies, LLC, Buyer's Affiliate, has access to sufficient cash, or has sufficient cash on hand or other sources of immediately available funds to enable Buyer to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.06  Solvency** Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 5.07  Legal Proceedings.** There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 5.08  Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE IV of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in ARTICLE IV of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE VI
## COVENANTS

**Section 6.01  Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise required by applicable Law, provided in this Agreement or as may be directed by the Bankruptcy Court or reasonably necessary to comply with an order of the Bankruptcy Court, set forth on Section 6.01 of the Disclosure Schedules, or consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall not engage in any material transaction outside of the ordinary course of the Business as it has historically been operated.

19

**(a)** Prior to the Closing, except to the extent required by the Bankruptcy Court or applicable Law, as expressly contemplated by this Agreement or with the prior written consent of Buyer, Seller shall:

(i) notify Buyer of any audit or other judicial proceeding in respect of any material Tax matter that is pending or has been threatened in writing with respect to the Business or the Purchased Assets;

(ii) use its commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business and the Purchased Assets; provided, that given Seller's current liquidity constraints, Seller's staffing and production levels, acceptance of orders and replenishment of inventory may vary from Seller's historical practices (B) preserve the condition of the Purchased Assets, (C) preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets and (D) preserve the present relationships with Persons having business dealings with Seller (including with Transferred Employees as well as customers and suppliers of Seller and the Business); provided, that that given Seller's current liquidity constraints, Seller's relationships with such Persons may vary from historical norms;

**(b)** Except to the extent required by the Bankruptcy Court or applicable Law, Seller shall not, with respect to the Business or any of the Purchased Assets, except as otherwise permitted by the Bankruptcy Court or an order of the Bankruptcy Court:

(i) permit any of the Purchased Assets to be subjected to any additional Encumbrances, other than Encumbrances that will be released as of the Closing;

(ii) sell, assign, license, transfer, convey, lease, permit to lapse or expire, or otherwise dispose of any assets, properties, rights or interests related to, used or held for use in the Business (including, without limitation, any spare parts) other than (i) inventory or obsolete equipment in the ordinary course of business and (ii) the Lot 1 Assets;

(iii) (A) except as set forth on Section 6.01(b)(iii) of the Disclosure Schedules, enter into any employment, deferred compensation, severance, retention, consulting or similar agreement or arrangement (or amend any such agreement or arrangement) with any Transferred Employee other than in the ordinary course of business, (B) create, establish, amend or terminate any Employee Benefit Plan, (C) grant any new, make any material change in, or accelerate the vesting or payment of any, compensation or benefits of any Transferred Employee, or (D) terminate the employment of any Transferred Employee (other than for cause);

(iv) change any material accounting or collection policies or practices (except for changes required by reason of any concurred change in GAAP);

(v)     terminate, waive, permit to lapse or expire or otherwise modify any insurance policies applicable to the Purchased Assets or the Assumed Liabilities;

(vi)     terminate, permit to lapse or expire or otherwise modify any licenses for Purchased Intellectual Property;

(vii)     terminate, permit to lapse or expire or otherwise modify any Permit; or

(viii)     authorize or agree, in writing or otherwise, to do anything prohibited by this Section 6.01.

**Section 6.02   Access to Information.** From the date hereof until the Closing, (a) Seller shall afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records and other documents and data related to the Business and Purchased Assets; (b) Seller shall furnish Buyer and its Representatives with such financial, operating and other data and information related to Seller's business as Buyer or any of its Representatives may reasonably request; (c) Seller shall afford, or cause its Representatives to afford, Buyer and its Representatives reasonable access to Purchased Asset Location to conduct an inspection of the Equipment and (d) Seller shall instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business and Purchased Assets, as applicable; *provided, however,* that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Seller.

**Section 6.03   Supplement to Disclosure Schedules.** From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**"). If as a result of matters disclosed in such Schedule Supplement, Buyer has the right to, but does not elect to, terminate this Agreement within five (5) Business Days of its receipt of such Schedule Supplement, then such Schedule Supplement shall be deemed to have cured any inaccuracy or breach of any representation or warranty contained in this Agreement, and Buyer shall be deemed to have irrevocably waived any closing condition or right to terminate this Agreement with respect to such matter.

**Section 6.04   Confidentiality.** Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 6.04 shall nonetheless continue in full force and effect.

**Section 6.05   Personally Identifiable Information.** Buyer shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Seller in effect on the date of this Agreement prohibiting the transfer of personally identifiable

21

information about individuals and otherwise comply with the requirements of the Bankruptcy Code.

### Section 6.06 Governmental Approvals and Consents.

**(a)** Each party hereto shall, as promptly as possible, use its commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

**(b)** Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 4.03 and Section 5.03 of the Disclosure Schedules; *provided, however*, that no Seller shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

### Section 6.07 Books and Records.

**(a)** In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, Buyer shall:

(i) retain the Books and Records (including personnel files) relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii) upon reasonable notice, afford Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records.

**(b)** Buyer shall not be obligated to provide Seller with access to books or records pursuant to this Section 6.07 where such access would violate applicable Law.

**Section 6.08 Closing Conditions.** From the date hereof until the Closing or termination of this Agreement in accordance with ARTICLE IX hereof, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE VII hereof.

**Section 6.09 Public Announcements.** Unless otherwise required by applicable Law or stock exchange requirements (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements or communications to Seller's employees in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), and the parties shall cooperate as to the

22

timing and contents of any such announcement, provided, however, that nothing herein shall prevent Seller from publicly disclosing the existence of this Agreement to the Bankruptcy Court for purposes of seeking entry of the Bankruptcy Bidding Procedures order and Bankruptcy Sale Order.

**Section 6.10 Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 6.11 Transfer Taxes; Periodic Tax.** Buyer shall bear and be responsible for paying one hundred percent (100%) of any sales, use, stamp, transfer, documentary, registration, and other similar Taxes (including related penalties (civil or criminal), additions to tax and interest) imposed by any Governmental Authority with respect to the transfer of the Purchased Assets to Buyer, other than any Taxes imposed by a Governmental Authority that is a foreign government, a political subdivision of a foreign government, or any foreign self-regulated organization, non-governmental regulatory authority or quasi-governmental authority ("**Transfer Taxes**"), regardless of whether any Tax authority seeks to collect such Taxes from Seller or Buyer. Buyer and Seller shall reasonably cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any such Transfer Taxes. To the extent the actual amount of Transfer Taxes is not known at Closing, Buyer and Seller shall utilize the most recent information available in determining the Purchase Price to be paid by Buyer to Seller at Closing pursuant to Section 2.05. Seller shall give prompt written notice to Buyer of any proposed adjustment or assessment of any Transfer Taxes with respect to the transactions contemplated hereby. In the case of any Periodic Tax that is payable with respect to any Proration Period, Seller shall be liable for the portion of any such Tax that is attributable to the portion of the period ending on the Closing Date, which shall be equal to the amount of such Tax multiplied by a fraction, the numerator of which is the number of days in the portion of the period ending on and including the Closing Date and the denominator of which is the total number of days in the entire period. To the extent the actual amount of Periodic Taxes is not known at Closing, Buyer and Seller shall utilize the most recent information available in determining the Purchase Price to be paid by Buyer to Seller at Closing pursuant to Section 2.05. Buyer and Seller shall cooperate fully as and to the extent reasonably requested by the other Party in connection with the filing of Tax Returns and any audit, litigation or other proceeding (each a "**Tax Proceeding**") with respect to Taxes imposed on or with respect to the Purchased Assets. Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

**Section 6.12 Bankruptcy Court Matters.**

(a) Notwithstanding anything in this Agreement to the contrary, this Agreement and the sale of the Purchased Assets are subject to the entry of the Bankruptcy Court of the Bankruptcy Sale Order. As promptly as practicable after the execution of this Agreement, Seller shall file a motion with the Bankruptcy Court seeking entry of the Bankruptcy Bidding Procedures Order and, subject to compliance therewith, the Bankruptcy Sale Order.

23

**(b)** Seller shall obtain entry by the Bankruptcy Court of the Sale Order no later than March 31 , 2025. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining the entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement.

**(c)** Seller shall pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Purchased Assets and the Assumed Liabilities to the Prevailing Bidder (as defined in the Bankruptcy Bidding Procedures Order) free from any and all successor or transferee liability to the extent permitted by section 363 of the Bankruptcy Code. Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Northern District of New York in obtaining the entry by the Bankruptcy Court of the Sale Order. In the event that the Sale Order is appealed or a stay pending appeal is sought, subject to the Parties' respective rights to terminate this Agreement pursuant to Section 9.01, Seller and Buyer shall use their respective reasonable efforts to oppose the appeal or the stay pending appeal and seek the dismissal of any appeal.

**(d)** Seller shall give prompt notice to the Buyer of, and shall provide the Buyer with copies of, any written bid received by Seller from any other prospective buyer for the sale of the Purchased Assets or the Business.

**Section 6.13 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents, including using commercially reasonable efforts to assist with the transfer of the Permits to the Buyer at Buyer's sole expense, including if necessary, entering into a transition services agreement on terms reasonably acceptable to Seller, provided, however, that Seller shall not be required to incur any costs in connection with such transition services agreement.

**Section 6.14 Real Estate Purchase Agreement.** Buyer shall cause RAC Holdings LLC, an affiliate of Buyer, to use commercially reasonable efforts to negotiate and enter into a Real Estate Purchase and Sale Agreement with Real Estate Seller and Seller governing the sale of the real property owned by Real Estate Seller and leased to Seller (the **"Real Estate Purchase Agreement"**) in form and substance reasonably acceptable to Seller within ten (10) Business Days after the date of this Agreement.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01 Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

**(a)** No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

**(b)** The Bankruptcy Sale Order shall have been entered by the Bankruptcy Court and the Bankruptcy Sale Order shall not be subject to a stay.

**Section 7.02 Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

**(a)** The representations and warranties of Seller contained in ARTICLE IV shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

**(b)** Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

**(c)** Seller shall have delivered to Buyer duly executed counterparts to the applicable Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(a).

**(d)** The Real Estate Purchase Agreement shall have been duly executed by Real Estate Seller and RAC Holdings LLC.

**(e)** Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the applicable conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied (the "**Seller Closing Certificate**").

**Section 7.03 Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

**(a)** The representations and warranties of Buyer contained in ARTICLE V shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that

25

address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b) Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c) Buyer shall have delivered to Seller the applicable portion of the Purchase Price, duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(b).

(d) Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer or an authorized person of Buyer, that each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied (the "**Buyer Closing Certificate**").

(e) Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

## ARTICLE VIII
## SURVIVAL OF OBLIGATIONS

**Section 8.01 Survival.** No representations or warranties of Seller made in this Agreement shall survive the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. To the extent the Closing does not occur because of the termination of this Agreement pursuant to ARTICLE IX below, the obligations of the parties shall be governed by such ARTICLE IX. Notwithstanding anything to the contrary contained herein, the provisions of Article IX and Article X shall survive any termination of this Agreement.

**Section 8.02 Limitation of Remedies Against Seller.** Anything to the contrary contained herein or in the common law notwithstanding, the remedies of Buyer with respect to any breach of any of the representations, warranties or agreements contained in this Agreement for all periods prior to the Closing shall be limited to the exercise of Buyer's termination rights under ARTICLE IX, and if the Closing occurs, all representations and warranties of Seller shall be deemed to have terminated and be without any further force or effect and Buyer thereupon will have no claim for indemnification against Seller for any such breach under this Agreement.

26

This Section 8.02 is to operate as an absolute limit and bar to recovery by or on behalf of Buyer regarding any such representations and warranties under this Agreement, whether or not such claims or recovery arise under this Agreement or under any statutory or common law cause of action or otherwise, and Buyer acknowledges and agrees that the termination provisions of this Agreement constitute Buyer's sole and exclusive remedy with respect thereto.

## ARTICLE IX
## TERMINATION

**Section 9.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by a Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure cannot be cured by Seller by five (5) days after the giving of written notice by the non breaching party of such breach;

(ii)    any of the conditions set forth in Section 7.01 or Section 7.02 shall not have been fulfilled by the Termination Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)    the Bankruptcy Court enters an order denying approval of the transactions contemplated in this Agreement and such order becomes final and non-appealable; or

(iv)    either: (1) Seller consummates an Alternate Transaction; (2) the board of directors (or similar governing body) of Seller resolves to approve any Alternate Transaction; or (3) the board of directors (or similar governing body of Seller) resolves to pursue any Alternate Transaction other than pursuant to the Bidding Procedures; or

(c)    by Seller by written notice to Buyer if:

(i)    Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure

27

cannot be cured by Buyer by five (5) days after the giving of written notice by the non breaching party of such breach;

(ii)     any of the conditions set forth in Section 7.01 or Section 7.03 shall not have been fulfilled by the Termination Date, unless such failure shall be due to the failure of a Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)     the Bankruptcy Court enters an order denying approval of the transactions contemplated in this Agreement and such order becomes final and non-appealable;

(iv)     the Bankruptcy Court enters an order approving Seller's entry into an Alternate Transaction; or

(v)     the Real Estate Purchase And Sale Agreement has not been executed by the Real Estate Seller and RAC Holdings within ten (10) Business Days after the entry of the Bankruptcy Sale Order by the Bankruptcy Court.

**(d)**     by Buyer or Seller in the event that:

(i)     there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited;

(ii)     the Closing has not occurred on or before thirty (30) days after the Bankruptcy Sale Order shall have been entered by the Bankruptcy Court (the "**Termination Date**"); provided, that the failure of the Closing to occur on or before the Termination Date is not the result of a material breach of this Agreement by the Party seeking such termination; or

(iii)     any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02   Effect of Termination.**

**(a)**     Upon the termination of this Agreement in accordance with Section 9.01 hereof, and except as set forth in Section 6.04, Section 6.05, Section 9.02(b) through Section 9.02(e) below, Article VIII, Article X, obligations for breaches of this Agreement occurring prior to such termination, and any section or covenant that explicitly states its survives termination, the Parties shall be relieved of any further obligations or liability under this Agreement.

**(b)**     Upon any termination pursuant to Section 9.01(c)(i), (i) other than as a result of any Buyer's material breach of or inaccuracy in the representation and warranty made by Buyer under Section 5.05, Seller shall be entitled to retain the Deposit and seek an additional 10% of Purchase Price; and (ii) as a result of any Buyer's material breach of

or inaccuracy in the representation and warranty made by Buyer under Section 5.05, Seller shall be entitled to retain the Deposit and seek an additional 20% of Purchase Price, each as liquidated damages for expenses incurred in connection with this Agreement (each of Section 9.02(b)(i) and Section 9.02(b)(ii) a "**Termination Cap**"). If Seller elects to terminate this Agreement pursuant to Section 9.01(c)(i), Seller's receipt of the Termination Cap shall be its sole and exclusive remedy of Seller and its Affiliates against Buyer or any of its Affiliates for any and all losses that may be suffered based upon, resulting from or arising out of such termination, and none of Buyer nor any of its Affiliates shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement.

(c) Upon any termination pursuant to Section 9.01(d)(ii) by Seller, Seller shall be entitled to retain the Deposit.

(d) Upon any termination other than pursuant to Section 9.01(c)(i) or 9.01(d)(ii), Seller shall return the Deposit to Buyer by wire transfer of immediately available funds no later than three (3) business days after such termination.

(e) If this Agreement is terminated pursuant to Section 9.01(b)(i), Section 9.01(b)(ii), Section 9.01(b)(iii) only if the Bankruptcy Court enters an order denying approval of the transaction for an Alternative Transaction, or Section 9.01(b)(iv) then Seller shall return the Deposit. Notwithstanding anything to the contrary in this Agreement, Buyer's receipt of the return of the Deposit shall be the sole and exclusive remedy of Buyer and its Affiliates against Seller or any of its Affiliates for any and all losses that may be suffered based upon, resulting from or arising out of such termination, and upon return of the Deposit, none of Seller nor any of its Affiliates shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement.

(f) Nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01 Employment.** Prior to and contingent upon the Closing, Buyer (or an Affiliate of Buyer) shall make offers of employment commencing on the Closing Date, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Buyer and such employee) and on such other terms and conditions as Buyer may determine, in its sole discretion, to each of the Transferred Employees designated by Buyer, in its sole discretion, who shall be employed by Buyer or an Affiliate of Buyer in connection with the Business. Seller shall terminate the employment of each Transferred Employee who receives an offer of employment from Buyer effective as of the Closing Date. Each such employee accepting an offer of employment with the Buyer and commencing employment with the Buyer on the Closing Date shall be considered a "**Hired Employee**." Buyer shall not be responsible for any compensation or other benefits due from Seller to any Hired Employees on or prior to the Closing Date. Buyer shall not be responsible for any severance liabilities or obligations with respect to any employees

21282960

of Seller whose employment is terminated on or prior to the Closing Date. Buyer shall not be responsible for any WARN Act Liabilities with respect to any employees of Seller whose employment is terminated on or prior to the Closing Date. Nothing expressed or implied in this Agreement is intended to confer upon any Person or his or her legal representatives any rights or remedies, including any rights of employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Nothing contained in this Section 10.01 or elsewhere in this Agreement shall be construed to modify any employee benefit plan of Buyer or Seller (or any Person acting as a professional employer organization or employee leasing company) or prevent the termination of employment of any employee or any change in the employee benefits available to any employee.

**Section 10.02 Expenses.** Except as otherwise expressly provided in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred; *provided, however*, that Seller shall pay all amounts, if any, payable to Calibre.

**Section 10.03 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third $(3^{rd})$ day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.03):

If to Seller:                     Crucible Industries LLC
                                  575 State Fair Blvd.
                                  Solvay, NY 13209
                                  E-mail: john.shiesley@crucible.com
                                  Attention:    John Shiesley, President

with a copy (which shall not constitute    Bond, Schoeneck & King PLLC
notice) to:                                One Lincoln Center
                                           Syracuse, New York 13202
                                           Attention: Charles J. Sullivan, Grayson T. Walter
                                           and Roderick C. McDonald
                                           Email: csullivan@bsk.com, gwalter@bsk.com and
                                           Rmcdonald@bsk.com

If to Buyer:

                                  Attention: Ross Castner

30

Lauter Metal Technologies LLC
1B Powell Lane
Penn Yan, NY 14527
E-mail: ross@optitorque.com

With a copy to (which shall not constitute notice to):
Woods Oviatt Gilman LLP
1900 Bausch & Lomb Place
Rochester, NY 14604
Attn: Katarina Polozie
Email: kpolozie@woodsoviatt.com

**Section 10.04 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation;" (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.05 Disclosure Schedules.** All section headings in the Disclosure Schedules correspond to the sections of this Agreement, but information provided in any section of the Disclosure Schedules shall constitute disclosure for purposes of each section of this Agreement where such information is relevant. Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned to such terms in this Agreement. Certain information set forth in the Disclosure Schedules is included solely for informational purposes, and may not be required to be disclosed pursuant to this Agreement. No disclosure in the Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. The inclusion of any information in the Disclosure Schedules shall not be deemed to be an admission or acknowledgment by Seller that in and of itself, such information is material to or outside the ordinary course of the business or is required to be disclosed on the Disclosure Schedules. No disclosure in the Disclosure Schedules shall be deemed to create any rights in any third party.

**Section 10.06 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.07 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.08 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.09 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that Buyer may assign this Agreement and the other Transaction Documents and any or all rights and obligations under this Agreement, in whole or in part, to any of its Affiliates without the prior consent of Seller. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.10 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.11 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 10.12 Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent

32

that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent as to the foregoing to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in the State of New York, County of Onondaga.

**Section 10.13 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at Law or in equity.

**Section 10.14 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

21282960

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

CRUCIBLE INDUSTRIES LLC

By _John Shirley_

Name: John Shirley

Title: President

LAUTER METAL TECHNOLOGIES LLC

By _____

Name:

Title:

Docusign Envelope ID: 570727B1-A8CD-4426-A4A7-67A0EC4168A3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

CRUCIBLE INDUSTRIES LLC

By _____

Name:

Title:

LAUTER METAL TECHNOLOGIES LLC

By _____
Name: Ross Castner

Title: Manager lauter metal technologies

## DISCLOSURE SCHEDULES

### to

## ASSET PURCHASE AGREEMENT

### between

## CRUCIBLE INDUSTRIES LLC

### and

## LAUTER METAL TECHNOLOGIES LLC

### dated as of

February 27 2025

These Disclosure Schedules have been prepared and delivered in accordance with the Asset Purchase Agreement dated as of February 27, 2025 (the "**Agreement**") between Crucible Industries LLC, a Delaware limited liability company ("**Seller**") and Lauter Metal Technologies LLC ("**Buyer**"). Capitalized terms used in this Disclosure Schedule and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Agreement.

These Disclosure Schedules are qualified in their entirety by reference to specific provisions of the Agreement, and are not intended to constitute, and shall not be construed as constituting, representations or warranties of a party except to the extent expressly provided in the Agreement. The headings contained in these Disclosure Schedules are for reference only and shall not be deemed to modify or influence the meaning or interpretation of the information contained in these schedules or in the Agreement.

For the purposes of these Disclosure Schedules, any information, item or other disclosure set forth in any schedule shall be deemed to have been set forth in all other reasonably applicable schedules and disclosed not only in connection with the representation and warranty specifically referenced in a given schedule hereof, but for all purposes relating to the representations and warranties of such party set forth in the Agreement, provided the relevance of such disclosure to any representation or warranty not specifically referenced is clearly apparent from the terms of such disclosure. Cross references are noted for purposes of convenience of reference only. Any disclosure contained in these Disclosure Schedules that refers to a document is qualified in its entirety by reference to the text of such document. No disclosure of any matter contained in these Disclosure Schedules shall create an implication or be taken as an admission by the party making such disclosure that such matter meets any standard of materiality or was required to be disclosed under the terms of any representations and warranties or covenants contained in the Agreement.

Schedule 2.01(a)

Equipment Schedule

Provided Separately

Schedule 2.01(g)

1. Auxilor Capital Partners, Inc. (Equipment lease for 2024 Bobcat s450 skid street loader with attachments)
2. Commercial Credit Group Inc (Equipment Lease for Grove Pickle Crane, model RT 650E)
3. CSX Transportation (Lease for right of way)
4. TCF Equipment Finance (Equipment lease for Argon/ Nitrogen Analyzer)
5. Thermo Scientific (Equipment lease for optical emission spectrometer)

21282960

Schedule 4.03

Seller Consents

None.

Schedule 4.07

Legal Proceedings

1. Endurance Metals LLC v. Seller, Harris County District Court, No. 2024-44018
2. G.O. Carlson, Inc. v. Seller, New York State Supreme Court, Onondaga County No. 009893/2024.
3. Voss Metals Company, Inc. v. Seller, New York State Supreme Court, Onondaga County No. 0022807/2024.
4. Delmar Everson v. Seller, New York State Division of Human Rights, Bronx, New York
5. Kendrick Rowser v. Seller, U.S. Equal Employment Opportunity Commission, Buffalo, New York.
6. Logan Chapman v. Seller.
7. The following actions, suits, claims, investigations or other legal proceedings have been threatened against Seller:
    a. Matheson Tri-Gas, Inc. made a demand of Seller for payment of $655,719.30 by letter dated April 1, 2024.
    b. Kairos Specialty metals Corpo. made a demand of Seller for payment of $67,440.96 by letter dated June 13, 2024
    c. Schenker, Inc. made a demand of Seller for payment of $328,146.66 by letter dated July 10, 2024.
    d. C2C Resources, LLLC, on behalf of Metal Marker Mfg. Co., made a demand of Seller for payment of $3,000 by letter dated September 20, 2024.
    e. GL Power. Inc., made a demand of Seller for payment of $31,311.76 by letter dated September 26 ,2024.
    f. JPW Structural Contracting, Inc. made a demand of Seller for payment of $22,520 by letter dated October 7, 2024
    g. Harbisonwalker International, Inc. made a demand of Seller for payment of $203,686,72 by letter dated October 17, 2024.
    h. Major Metals Corporation made a demand of Seller for payment of $86,814.44 by letter dated October 18, 2024.
    i. Leib Solutions, on behalf of Customized Energy Solutions Ltd., made a demand of Seller for payment of $13,000 by letter dated October 28. 2024.
    j. J. Solotken and Co. Inc. made a demand of Seller for payment of $16,767.66 by letter dated November 4, 2024.

21282960

Schedule 4.08(a)

Compliance with Laws

1. See disclosures on Schedule 4.08(b).

21282960

## Schedule 4.08(b)

### Permits

1. On January 24, 2025 the New York Department of Environmental Conservation provided Seller with a certain Notice of Violation re Oil & Grease Investigation Summary Report, September 30, 2024 Order on Consent: R7-20211030-88 SPDES NY 0000825, a copy of which has been made available to Buyer.

2. On or about November 25, 2024, Onondaga County notified Seller of a violation of its water discharge permit.

21282960

Schedule 4.09

Taxes

None.

Schedule 4.10(a)

Intellectual Property

See attached

21282960

| Country | Title | App. Number | Patent Number | Exp. Date | Status |
|---|---|---|---|---|---|
| United States | Corrosion and Wear Resistant Alloy | 11/598,082 | 7288157 | 5/9/2025 | Patented |
| China | Corrosion and Wear Resistant Alloy | 200610080137.8 | 1861826 | 5/9/2026 | Patented |
| Hong Kong | Corrosion and Wear Resistant Alloy | 07100385.6 | 1095164 | 5/9/2026 | Patented |
| Japan | Corrosion and Wear Resistant Alloy | 2006-130432 | 5165211 | 5/9/2026 | Patented |
| Canada | Cold-Work Tool Steel Article | 2603591 | 2603591 | 1/22/2027 | Patented |
| Mexico | Cold-Work Tool Steel Article | 2007/011887 | 277258 | 9/26/2027 | Patented |
| Taiwan | Cold-Work Tool Steel Article | 96135926 | 434943 | 9/26/2027 | Patented |
| Austria | Cold-Work Tool Steel Article | 07253844.0 | 546559 (EP 1905858) | 9/27/2027 | Patented |
| Belgium | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| EPO | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| Finland | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| France | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| Germany | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| Poland | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |

| Portugal | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| Spain | Cold-Work Tool Steel Article | 07253844.0 | 2395197 (EP 1905858) | 9/27/2027 | Patented |
| Sweden | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| Turkey | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| Ukraine | Cold-Work Tool Steel Article | a2007/0702 | 89984 | 9/27/2027 | Patented |
| United Kingdom | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/27/2027 | Patented |
| India | Cold-Work Tool Steel Article | 2037/DEL/2007 | 285678 | 9/28/2027 | Patented |
| Korea | Cold-Work Tool Steel Article | 10-2007-0098259 | 1518723 | 9/28/2027 | Patented |
| China | Cold-Work Tool Steel Article | 200710163039.5 | 101397630 | 9/29/2027 | Patented |
| Czech Republic | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/29/2027 | Patented |
| Denmark | Cold-Work Tool Steel Article | 07253844.0 | 1905858 | 9/29/2027 | Patented |
| Hong Kong | Cold-Work Tool Steel Article | 09108252.7 | 1128500 | 9/29/2027 | Patented |
| Italy | Cold-Work Tool Steel Article | 07253844.0 | 502012902020529 15 (EP 1905858) | 9/29/2027 | Patented |
| Canada | Corrosion and Wear Resistant Alloy | 2609829 | 2609829 | 11/6/2027 | Patented |
| Taiwan | Corrosion and Wear Resistant Alloy | 96142197 | 415955 | 11/7/2027 | Patented |

| Mexico | Corrosion and Wear Resistant Alloy | 2007/013974 | 273666 | 11/8/2027 | Patented |
|---|---|---|---|---|---|
| United States | Cold-Work Tool Steel Article | 11/529,237 | 7615123 | 4/19/2028 | Patented |
| Brazil | Cold-Work Tool Steel Article | PI0704153 | PI0704153 | 5/15/2028 | Patented |

| Owner | Country | Mark | Serial # | Application Filing Date | Registration Number | Registration Date | Goods & Services | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Argentina | CPM | 2039769 | 07/05/1996 | 2646960 | 06/19/2003 | - Molds, dies and parts for motors produced with metallurgical powders | Registered |
| Crucible Industries LLC | Australia | CPM | 712303 | 07/05/1996 | 712303 | 07/05/1996 | 6 - Powder metallurgy products in this class; common metals and their alloys | Registered |
| Crucible Industries LLC | Australia | CPM1V | 808370 | 09/24/1999 | 808370 | 09/24/1999 | 6 - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Australia | CRUCIBLE | 786859 | 07/04/1996 | 786859 | 07/04/1996 | 6 - Metals and materials, including alloys and carbon tool steels, stainless and valve steels; nonferrous metals, including titanium, titanium alloys; nickel alloys, cobalt alloys and intermetallics; none of the foregoing being manufactured by the crucible process<br>42 - Consulting services in the field of metallurgy, material sciences and materials; none of the foregoing relating to the crucible process | Registered |
| Crucible Industries LLC | Australia | CRUCIBLE CPM REX | 269876 | 07/04/1973 | 269876 | 07/04/1973 | 6 - High-speed steels and tool steels (none being stainless steel) for use in the manufacture of dies and high-speed tools | Registered |
| Crucible Industries LLC | Austria | CRUCIBLE CPM REX | AM1888/73 | 07/04/1973 | 75607 | 07/04/1973 | 06 - Unwrought and partly wrought common metals and their alloys, anchors, anvils, bells, rolled and cast building materials, and other metallic materials for railway tracks, chains, except driving chains for vehicles, cables and wires (non-electric), locksmiths' work, metallic pipes and tubes, safes and cash boxes, steel balls, horseshoes, nails and screws and other goods in non-precious metal not included in other classes, ores<br>07 - Machines and machine tools, motors (except for land vehicles), machine couplings and belting (except for land vehicles), large size agricultural implements, incubators | Registered |
| Crucible Industries LLC | Benelux | CPM | 598,558 | 07/03/1973 | 321903 | 07/03/1983 | - Unwrought and partially wrought common metals and their alloys and products made there from as far as they are included in Class 6; and machines (as far as they are not included in other classes) and machine tools; motors (except for vehicles); couplings and belting (except for vehicles); large size agricultural implements; incubators; machine tools and cutting tools (parts of machine tools); parts and accessories therefor in Class 7 | Registered |
| Crucible Industries LLC | Benelux | CPM 15V | 805,335 | 10/25/1993 | 541193 | 10/25/1993 | - Powder metallurgy, tool steel, and bar products | Registered |
| Crucible Industries LLC | Brazil | 15V | 819637190 | 11/18/1996 | 819637190 | 07/06/1999 | - Tool steel | Registered |
| Crucible Industries LLC | Brazil | 3V | 823505560 | 01/05/2001 | 823505581 | 07/03/2007 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Brazil | CI Logo | 830549064 | 03/18/2010 | 830549064 | 05/24/2016 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Brazil | CPM | 12523-73 | 07/06/1973 | 006814557 | 11/25/1978 | - Metals, including tool steel, steel alloys and powder metallurgy produced alloys | Registered |
| Crucible Industries LLC | Brazil | CPM 15V | 817575081 | 10/26/1993 | 817575081 | 08/08/1995 | - Bar products and tool steel | Registered |

| Owner | Country | Mark | Number | Date | Number | Date | Goods | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Brazil | CRUCIBLE | 8182215000 | 12/23/1994 | 818221500 | 10/08/1996 | - Specialty steels, including stainless steels and tool steels, and superalloys and titanium-based alloys, produced by both casting and powder-metallurgy practices; clad metal products, and tubular metal products; permanent magnet alloys for use in the production of permanent magnets. | Registered |
| Crucible Industries LLC | Brazil | CRUCIBLE INDUSTRIES | 830549048 | 03/18/2010 | 830549048 | 02/05/2013 | 06 - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Brazil | REX | 12522-73 | 07/06/1973 | 006814549 | 11/25/1978 | - Metals including tool steel, steel alloys, and power metallurgy produced alloys | Registered |
| Crucible Industries LLC | Brazil | S125V | 822681480 | 05/04/2000 | 822681480 | 05/29/2007 | - Tool steel used for knives | Registered |
| Crucible Industries LLC | Brazil | S30V | 822681455 | 05/04/2000 | 822681455 | 05/29/2007 | - Tool steel used for knives | Registered |
| Crucible Industries LLC | Brazil | S35VN | 908559208 | 11/06/2014 | 908559208 | 05/23/2017 | - Tool steel | Registered |
| Crucible Industries LLC | Brazil | S90V | 822681498 | 05/04/2000 | 822681498 | 05/29/2007 | - Tool steel used for knives | Registered |
| Crucible Industries LLC | Canada | 10V | 828152 | 11/07/1996 | 503099 | 10/28/1998 | - Tool steel in the form of metal powder, round and flat bars, and sheets and plates | Registered |
| Crucible Industries LLC | Canada | 15V | 828154 | 11/07/1996 | 503096 | 10/28/1998 | - Tool steel in the form of metal powder, round and flat bars, and sheets and plates | Registered |
| Crucible Industries LLC | Canada | 1V | 1028161 | 07/20/1999 | 567392 | 09/13/2002 | - Tool steel in the form of metal powder, round bars, flat bars, sheets, plates, rods, billets and blocks | Registered |
| Crucible Industries LLC | Canada | 20CV | 1697695 | 10/10/2014 | 938467 | 05/10/2016 | - Tool steel in the form of metal powder, compacts, blooms, billets, rods, round bars, flat bars, sheets, and plates | Registered |
| Crucible Industries LLC | Canada | 3V | 833427 | 01/13/1997 | 522071 | 01/24/2000 | - Tool steel | Registered |
| Crucible Industries LLC | Canada | 420V | 1117121 | 10/01/2001 | 562737 | 10/21/2003 | - Metals and alloys, including tool steel. | Registered |
| Crucible Industries LLC | Canada | 9V | 828142 | 11/07/1996 | 503100 | 10/28/1998 | - Tool steel in the form of metal powder, round and flat bars, and sheets and plates | Registered |
| Crucible Industries LLC | Canada | CI Logo | 1472016 | 03/05/2009 | 835172 | 10/29/2012 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Canada | CPM | 828153 | 11/07/1996 | 491027 | 03/06/1998 | - Metals and alloys in powdered form | Registered |
| Crucible Industries LLC | Canada | CRUCIBLE | 412938 | 07/08/1977 | 231548 | 01/19/1979 | - Magnets, high speed steels, tool steels, superalloys, stainless steels, alloy and carbon steels, non-ferrous metals, titanium alloys, refractory metals and refractory metal alloys, in the form of blooms, billets, slabs, plates, bars, castings, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Canada | CRUCIBLE CPM REX | 365928 | 07/03/1973 | 198993 | 05/01/1974 | - Powder metallurgy produced alloys | Registered |
| Crucible Industries LLC | Canada | CRUCIBLE INDUSTRIES | 1472014 | 03/05/2009 | 835173 | 10/29/2012 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Canada | CRU-WEAR | 827478 | 10/03/1996 | 491369 | 03/13/1998 | - Tool steel, wear resistant steel in the form of billet, plate, block and bar | Registered |

| Company | Country | Mark | | | | | Description | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Canada | REX | 1058099 | 05/09/2000 | 559509 | 03/20/2002 | - Common metals and their alloys, tool steel, hand tools, hand and power operated metal cutting tools and metal bits | Registered |
| Crucible Industries LLC | Canada | REX 121 | 1000705 | 12/29/1998 | 593842 | 11/04/2003 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Canada | S30V | 1065169 | 06/28/2000 | 585706 | 07/22/2003 | - Metals and alloys, namely, tool steel in the form of metal powder, compacts, blooms, billets, rods, round bars, flat bars, sheets and plates | Registered |
| Crucible Industries LLC | Canada | S35VN | 1701513 | 12/11/2014 | 925959 | 01/14/2016 | - Tool steel | Registered |
| Crucible Industries LLC | Canada | S90V | 1065172 | 06/28/2000 | 585736 | 07/22/2003 | - Metals and alloys, namely, tool steel in the form of metal powder, compacts, blooms, billets, rods, round bars, flat bars, sheets and plates | Registered |
| Crucible Industries LLC | Chile | CPM | 348328 | 07/05/1996 | 1240676 | 03/25/1997 | - Powder metallurgy products, all products in Class 6 | Registered |
| Crucible Industries LLC | Chile | CRUCIBLE | 355475 | 09/16/1996 | 1255759 | 08/26/1997 | - Metals and materials, including alloy and carbon tool steels, stainless and valve steels, nonferrous metals, including titanium, titanium alloys, nickel alloy, cobalt alloys, and intermetallics | Registered |
| Crucible Industries LLC | China | CI Logo | 8240019 | 04/26/2010 | 12277849 | 08/13/2016 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | China | CPM | 20000843 55 | 06/14/2000 | 1609695 | 07/28/2001 | 6 - Steel alloys, cast steel, unwrought or semi-unwrought steel, steel strip, steel sheets, ferrotitanium, titanium alloys, nickel alloys, cobalt alloys, alloys of common metal, unwrought or semi-wrought common metals, powder metallurgy products | Registered |
| Crucible Industries LLC | China | CPM | 96012072 5 | 10/31/1996 | 1129452 | 11/21/1997 | 6 - Powder metallurgy products | Registered |
| Crucible Industries LLC | China | CPM REX | 8123091 | 03/16/2010 | 8123091 | 03/20/2011 | - Alloy steel, cast steel; steel, unwrought or semi-wrought; steel strip; steel sheets; ferrotitanium; titanium alloy; nickel alloy; cobalt alloy; alloys of common metal; common metals, unwrought or semi-wrought | Registered |
| Crucible Industries LLC | China | CPM S30V | 22047606 | 11/28/2016 | | | - Tool steel | Pending |
| Crucible Industries LLC | China | CPM S35VN | 22047607 | 11/28/2016 | | | - Tool steel | Pending |
| Crucible Industries LLC | China | CPM1V | 98001194 17 | 10/09/1999 | 1527304 | 02/21/2001 | - Common metals, unwrought and semi-wrought; alloys of common metal, and tool steel | Registered |
| Crucible Industries LLC | China | CRUCIBLE INDUSTRIES | 8240017 | 04/26/2010 | 8240017 | 05/21/2012 | - Alloy and steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | China | REX 121 | 98001474 67 | 12/29/1998 | 2024218 | 02/28/2003 | - Tool steel | Registered |
| Crucible Industries LLC | Czech Republic | CPM 15V | 134465 | 07/15/1998 | 220934 | 10/27/1999 | - Tool steel | Registered |
| Crucible Industries LLC | Czech Republic | CPM 1V | 161218 | 11/20/2000 | 240235 | 01/25/2002 | - Tool steel | Registered |

| Owner | Country | Mark | Application Number | Application Date | Registration Number | Registration Date | Goods/Services | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Czech Republic | CRUCIBLE | 113,000 | 07/12/1996 | 200765 | 05/26/1997 | - Metals and materials, including alloy and carbon tool steels; stainless and valve steels; nonferrous metals, including titanium; titanium alloys; nickel alloy, cobalt alloys, and intermetallics in Class 6; permanent magnets and magnet assemblies; computer software, namely, business application and financial application software in Class 9; and consulting services in the field of metallurgy, material sciences and materials, magnetic circuit design, and software design in Class 42 | Registered |
| Crucible Industries LLC | Czech Republic | REX 121 | 139397 | 01/25/1999 | 225501 | 01/25/1999 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | European Union | 10V | 153,916 | 04/01/1996 | 153,916 | 05/04/1998 | - Metals and alloys | Registered |
| Crucible Industries LLC | European Union | 15V | 153,882 | 04/01/1996 | 153,882 | 06/22/1998 | - Metals and alloys | Registered |
| Crucible Industries LLC | European Union | 1V | 1300094 | 09/07/1999 | 1300094 | 11/20/2000 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | European Union | 3V | 487,348 | 03/07/1997 | 487,348 | 12/16/1999 | - Tool steel | Registered |
| Crucible Industries LLC | European Union | 420V | 104,950 | 04/01/1996 | 104,950 | 06/18/1998 | - Metals and alloys | Registered |
| Crucible Industries LLC | European Union | 9V | 102,681 | 04/01/1996 | 102,681 | 04/01/1996 | - Metals and alloys | Registered |
| Crucible Industries LLC | European Union | CI Logo | 008952236 | 03/15/2010 | 8952236 | 09/14/2010 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip, in Class 6, and technical consulting services the field of metallurgy, in Class 42 | Registered |
| Crucible Industries LLC | European Union | CPM | 102,475 | 04/01/1996 | 102,475 | 04/24/1998 | - Metals and alloys in Class 6; and machines; and machine tools, motors and parts thereof in Class 7 | Registered |

| Owner | Jurisdiction | Mark | App. No. | Filing Date | Reg. No. | Reg. Date | Goods | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | European Union | CRUCIBLE | 102,558 | 04/01/1996 | 102,558 | 04/01/1996 | - Common metals and their alloys; metal building materials; transportable buildings of metal; materials of metal for railway tracks; non-electric cables and wires of common metal; ironmongery; small items of metal hardware; pipes and tubes of metal; safes; goods of common metal not included in other classes; ores; unwrought and partly wrought common metals and their alloys; tool steel, anchors, anvils, bells, rolled and cast building materials; rails and other metallic materials for railway traces; chains (except driving chains for vehicles); cables and wires (non-electric); locksmiths' work; cash boxes; steel balls; horseshoes; nails and other screws; other goods in non-precious metal not included in other classes; and parts and fittings for all the aforesaid goods; all included in Class 6; Machines and machine tools; motors and engines (except for land vehicles); machine coupling and transmission components (except for land vehicles); agricultural implements; incubators for eggs; drilling machines; belting; and parts and fittings for all the aforesaid goods, all included in Class 7; Nautical, surveying, the aforesaid goods; all included in Class 7; Nautical, surveying, electric, photographic cinematographic, optical, weighing, signaling, life-saving and teaching apparatus and instruments; apparatus for recording, transmission or reproduction of sound or images; magnetic data carriers, recording discs; automatic vending machines and mechanisms for coin-operated apparatus; cash registers, calculating machines, data processing equipment and computers; fire-extinguishing apparatus. Magnets; permanent magnets and alloys and parts and fittings for all the aforesaid goods; all included in Class 9; but not including crucibles or furnaces; Scientific and industrial research; computer programming; consulting services in the field of metallurgy and software design in Class 42 | Registered |
| Crucible Industries LLC | European Union | CRUCIBLE INDUSTRIES | 008952301 | 03/15/2010 | 8952301 | 09/14/2010 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip, in Class 6; and technical consulting services the field of metallurgy, in Class 42 | Registered |
| Crucible Industries LLC | European Union | REX | 131,573 | 04/01/1996 | 131573 | 11/19/1999 | - Common metals and their alloys | Registered |
| Crucible Industries LLC | European Union | REX 121 | 1030311 | 12/29/1998 | 1030311 | 02/29/2000 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | European Union | S30V | 1727767 | 06/28/2000 | 1727767 | 09/17/2001 | - Metal and alloys, including tool steel | Registered |
| Crucible Industries LLC | European Union | S35VN | 13433801 | 11/05/2014 | 13433801 | 03/24/2015 | - Tool steel | Registered |
| Crucible Industries LLC | European Union | S60V | 1728559 | 06/28/2000 | 1728559 | 10/16/2001 | - Tool steel used for knives | Registered |
| Crucible Industries LLC | European Union | S90V | 1728575 | 06/28/2000 | 1728575 | 09/17/2001 | - Metal and alloys, including tool steel | Registered |
| Crucible Industries LLC | France | CPM | 1237591 | 06/02/1983 | 1237591 | 06/02/1983 | 06 - Unwrought and partially wrought common metals and their alloys and products | Registered |

| Owner | Country | Mark | App. No. | App. Date | Reg. No. | Reg. Date | Goods | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | France | CPM 15V | 489334 | 10/25/1993 | 93489334 | 10/25/1993 | 06 - Metallic products in bars, not included in other classes; tool steel | Registered |
| Crucible Industries LLC | Germany | 10V | 39757934.9 | 12/03/1997 | 39757934 | 02/02/1998 | - Common metals and their alloys | Registered |
| Crucible Industries LLC | Germany | 15V | 39757935.7 | 12/03/1997 | 39757935 | 02/02/1998 | - Common metals and their alloys | Registered |
| Crucible Industries LLC | Germany | 9V | 39757933.0 | 12/03/1997 | 39757933 | 02/02/1998 | - Common metals and their alloys | Registered |
| Crucible Industries LLC | Germany | CPM | 39757937.3 | 12/03/1997 | 39757937 | 02/04/1998 | - Common metals and their alloys | Registered |
| Crucible Industries LLC | Germany | CRUCIBLE CPM REX | 920.747 | 08/24/1973 | 920747 | 08/27/1973 | 6 - Unwrought and partially wrought common metals and their alloys and products included in Class 6 made there from, namely, bars, blocks, rods, sheets, tubes, wires (non-electric), ingots, blooms, billets and tool blanks 7 - Machine tools and parts therefor, including cutting edges and bits | Registered |
| Crucible Industries LLC | Germany | REX | C 13848/9a Wz | 07/15/1963 | 798491 | 07/18/1963 | - Tool steel and tool-steel alloys of all kinds and for all purposes | Registered |
| Crucible Industries LLC | Hong Kong | CPM10V | 200100430 1 | 01/09/2001 | 2002B00610 | 01/16/2002 | - Metals and common metal alloys, tool steel | Registered |
| Crucible Industries LLC | Hong Kong | CPM1V | 199913437 | 09/27/1999 | 2000B15372 | 11/22/2000 | 6 - Metals and alloys, tool steel | Registered |
| Crucible Industries LLC | Hong Kong | CPM9V | 200100430 5 | 01/09/2001 | 2002B00611 | 01/16/2002 | - Metals and common metal alloys, tool stee | Registered |
| Crucible Industries LLC | Hungary | 10V | M960392 8 | 11/27/1996 | 145757 | 11/27/1996 | - Tool steel | Registered |
| Crucible Industries LLC | Hungary | 1V | M990417 6 | 09/06/1999 | 162248 | 09/06/1999 | - Tool steel (based on priority); metals and alloys (not based on priority) | Registered |
| Crucible Industries LLC | Hungary | CPM | M960372 9 | 11/12/1996 | 145716 | 11/12/1996 | - Powder metallurgy products | Registered |
| Crucible Industries LLC | Hungary | REX 121 | M980544 2 | 12/29/1998 | 161194 | 07/06/2000 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | India | 10V | 1041917 | 09/04/2001 | 1041917 | 12/29/2005 | - Tool steels | Registered |
| Crucible Industries LLC | India | CPM1V | 880820 | 10/08/1999 | 880820 | 02/09/2018 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | India | CRUCIBLE | 345254 | 01/27/1979 | 345254 | 01/27/1979 | - Unwrought and partly wrought common metals and their alloys and products included in Class 6 and made there from | Registered |
| Crucible Industries LLC | India | CRUCIBLE CPM REX | 289443 | 07/16/1973 | 289443 | 07/16/1973 | - Unwrought and partially wrought common metals and their alloys and products included in Class 6 made therefrom | Registered |
| Crucible Industries LLC | Indonesia | 10V | D96-24029 | 12/30/1996 | IDM00008161 6 | 10/14/1997 | - Tool steel | Registered |
| Crucible Industries LLC | Indonesia | 15V | D96-24028 | 10/30/1996 | IDM00008489 2 | 10/14/1997 | - Tool steel | Registered |
| Crucible Industries LLC | Indonesia | 420V | D96-25218 | 11/14/1996 | IDM00008838 | 10/17/1997 | - Tool steel | Registered |
| Crucible Industries LLC | Indonesia | CPM | D96-25213 | 11/14/1996 | IDM00010172 2 | 10/17/1997 | - Powder metallurgy products | Registered |

| Owner | Country | Mark | App/Serial No. | Filing Date | Reg. No. | Reg. Date | Goods/Services | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Italy | CPM | 19209C/73 3 | 07/16/1973 | 1556090 | 05/19/1976 | 06 - Unwrought and partly wrought common metals and their alloys, anchors, anvils, bells, rolled and cast building materials, rails and other metallic materials for railway tracks; chains (except driving chains for vehicles); cables and wires (non-electric) locksmiths' work; metallic pipes and tubes; safes and cash boxes; steel balls; horseshoes; nails and screws; other goods in non-precious metal not included in other classes; ores | Registered |
| Crucible Industries LLC | Italy | CPM 15V | MI93C007327 | 10/26/1993 | 1554599 | 05/20/1996 | 06 - Bar products and tool steel | Registered |
| Crucible Industries LLC | Italy | CRUCIBLE | 2864C/73 | 12/11/1973 | 548509 | 03/15/1976 | 07 - Machine tools and parts and accessories therefore, machine tool bits; motors (except for land vehicles); machine couplings and belting (except for land vehicles); large size agricultural implements; incubators | Registered |
| Crucible Industries LLC | Italy | REX | 59/102 | 08/12/1961 | 1458779 | 08/12/1961 | - Steels and steel alloys of all kinds and for all purposes, tubes and pipes, welding rods unwrought and partly wrought common metals and their alloys; anchors, anvils, bells, rolled and cast building materials; rails and other metallic materials for railway tracks; chains (except driving chains for vehicles); cables and wires (non-electric), locksmiths' work; metallic pipes and tubes; safes and cash boxes, steel balls; horseshoes; nails and screws and other goods in non-precious metal not included in other classes; ores | Registered |
| Crucible Industries LLC | Japan | CI Logo | 2010-018240 | 03/10/2010 | 5352493 | 09/10/2010 | - Alloy and tool steels, stainless steels, slabs, plates, bars, forgings, wire, sheet, and strip; Irons and steels; Nonferrous metals and their alloys form of blooms, billets, | Registered |
| Crucible Industries LLC | Japan | CPM 10V | 2001-000671 | 01/09/2001 | 4597543 | 08/23/2002 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Japan | CPM 15V | 2001-000672 | 01/09/2001 | 4597544 | 08/23/2002 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Japan | CPM 420V | 2001-000673 | 01/09/2001 | 4597545 | 08/23/2002 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Japan | CPM S30V | 2000-077783 | 07/12/2000 | 4621513 | 11/15/2002 | - Tool steel used for knives, other irons and steels, nonferrous metals and their alloys | Registered |
| Crucible Industries LLC | Japan | CPM S90V | 2000-077785 | 07/12/2000 | 4621515 | 11/15/2002 | - Tool steel used for knives, other irons and steels, nonferrous metals and their alloys | Registered |
| Crucible Industries LLC | Japan | CRUCIBLE | S49-052127 | 03/28/1973 | 1168353 | 11/01/1975 | - Common metals and their alloys and all other goods included in Class 6 | Registered |
| Crucible Industries LLC | Japan | CRUCIBLE CPM REX | S50-88237 | 06/24/1975 | 1402373 | 12/27/1979 | - Powder metallurgy produced alloys and all other goods in this class | Registered |
| Crucible Industries LLC | Japan | CRUCIBLE INDUSTRIES | 2010-018241 | 03/10/2010 | 5411905 | 05/13/2011 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip; Irons and steels; Nonferrous metals and their alloys | Registered |
| Crucible Industries LLC | Korea - South | 15V | 96-38430 | 08/29/1996 | 430215 | 11/20/1998 | - Tool steel | Registered |
| Crucible Industries LLC | Korea - South | 420V | 96-38431 | 08/29/1996 | 393168 | 01/26/1998 | - Tool steel | Registered |

| Owner | Country | CI Logo | App. No. | App. Date | Reg. No. | Reg. Date | Description | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Korea - South | CI Logo | 40-2010-0017635 | 04/02/2010 | 890137 | 11/15/2011 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Korea - South | CPM | 96-29766 | 07/09/1996 | 404759 | 06/16/1998 | - Tool steel in the form of metal powder, round and flat bar, sheets and plates | Registered |
| Crucible Industries LLC | Korea - South | CPM 10V | 20000043 366 | 09/15/2000 | 504788 | 10/29/2001 | - Tool steel | Registered |
| Crucible Industries LLC | Korea - South | CPM 15V | 93-37666 | 10/23/1993 | 358198 | 03/20/1997 | - Highly wear resistant tool steel for dies, punches, industrial knives, etc., and highly wear resistant tool steel in bar form for dies, punches, industrial knives, etc. | Registered |
| Crucible Industries LLC | Korea - South | CPM 1V | 99-37451 | 10/06/1999 | 483707 | 12/18/2000 | - Tool steel | Registered |
| Crucible Industries LLC | Korea - South | CPM 9V | 20000043 365 | 09/15/2000 | 504787 | 10/29/2001 | - Tool steels | Registered |
| Crucible Industries LLC | Korea - South | CRUCIBLE | 96-29257 | 07/05/1996 | 404757 | 06/16/1998 | - Stainless steel, high-speed steel, tool steel, die steel, carbon alloy steel, all the foresaid goods are in the form of bars, slabs, pipe, wire, sleet and billets, carbon tool steel, stainless, valve steel, titanium, titanium alloys, nickel alloys, cobalt alloys, intermetallics, nonferrous metals | Registered |
| Crucible Industries LLC | Korea - South | CRUCIBLE INDUSTRIES | 40-2010-0017636 | 04/02/2010 | 890106 | 11/15/2011 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Korea - South | REX | 96-29765 | 07/09/1996 | 393135 | 01/26/1998 | - Tool steel | Registered |
| Crucible Industries LLC | Korea - South | REX 121 | 98-34565 | 12/29/1998 | 460827 | 12/15/1999 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Malaysia | 10V | 97/02778 | 03/07/1998 | 97002778 | 03/07/1998 | - Tool steel | Registered |
| Crucible Industries LLC | Malaysia | 9V | 97/02206 | 02/25/1997 | 97002206 | 02/25/1997 | - Tool steels, all included in Class 6 | Registered |
| Crucible Industries LLC | Malaysia | CPM | 97/02207 | 02/25/1997 | 97002207 | 02/25/1997 | - Powder metallurgy products | Registered |
| Crucible Industries LLC | Malaysia | CPM 1V | 99/0235 | 10/13/1999 | 99010235 | 10/13/1999 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Malaysia | CRUCIBLE | 97/02208 | 02/25/1997 | 97002208 | 02/25/1997 | - Metals and materials, including alloy and carbon tool steels; stainless and valve steels; nonferrous metals, including titanium, titanium alloys; nickel alloy, cobalt alloys, and intermetallics | Registered |
| Crucible Industries LLC | Mexico | 10V | 268,253 | 07/15/1996 | 635835 | 12/10/1999 | - Tool steel | Registered |
| Crucible Industries LLC | Mexico | 1V | 390204 | 09/08/1999 | 638547 | 01/26/2000 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Mexico | CI Logo | 1073044 | 03/09/2010 | 1181706 | 09/09/2010 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Mexico | CPM | 281,856 | 12/09/1996 | 539,807 | 01/24/1997 | - Powder metallurgy products | Registered |
| Crucible Industries LLC | Mexico | CPM 15V | 181,501 | 10/26/1993 | 456,981 | 04/13/1994 | - Bar products and tool steel | Registered |
| Crucible Industries LLC | Mexico | CRUCIBLE | 107,625 | 01/21/1963 | 112,903 | 01/21/1983 | - Metals including alloy and carbon steels, non-ferrous metals including titanium, titanium alloys, refractory metals and refractory metal alloys in the form of blooms, billets, slabs, plates, bars, castings, forgings, wire, sheet and strip | Registered |

| Owner | Country | Mark | App. No. | App. Date | Reg. No. | Date | Reg. No. | Date | Goods | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Mexico | CRUCIBLE INDUSTRIES | 1073043 | 03/09/2010 | | | 1181705 | 09/29/2010 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Mexico | REX | 281,857 | 12/09/1996 | 650630 | | | 04/19/2000 | - Tool steel | Registered |
| Crucible Industries LLC | Mexico | REX 121 | 358922 | 01/04/1999 | 609078 | | | 04/20/1999 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Mexico | S30V | 433,664 | 06/29/2000 | 682253 | | | 12/20/2000 | - Metals and their alloys, including tool steel and steel for tools for use in knives | Registered |
| Crucible Industries LLC | Mexico | S35VN | 1546241 | 11/06/2014 | 1606605 | | | 01/25/2016 | - Tool steel | Registered |
| Crucible Industries LLC | Mexico | S60V | 443,665 | 06/29/2000 | 682254 | | | 12/20/2000 | - Metals and their alloys, including tool steel and steel for tools for use in knives | Registered |
| Crucible Industries LLC | Norway | CRUCIBLE | 984236 | 07/11/1996 | 183774 | | | 07/24/1997 | - Metals and materials, including alloy and carbon tool steels, stainless and valve steels; nonferrous metals, including titanium, titanium alloys, nickel alloy, cobalt alloys, and intermetallics in Class 6; permanent magnets and magnet assemblies; computer software, namely, business application and financial application software in Class 9; and consulting services in the field of metallurgy, material sciences and materials, magnetic circuit design, and software design in Class 42 | Registered |
| Crucible Industries LLC | Norway | REX 121 | 1998 12015 | 12/29/1998 | 209732 | | | 08/09/2001 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Poland | 10V | Z-164528 | 09/24/1996 | 119943 | | | 11/30/2000 | - Tool steel | Registered |
| Crucible Industries LLC | Poland | 1V | Z-209149 | 10/29/1999 | 146121 | | | 04/08/2004 | - Metals and alloys including tool steel | Registered |
| Crucible Industries LLC | Poland | CPM | Z-164529 | 09/24/1996 | 116238 | | | 12/14/1999 | - Powder metallurgy products | Registered |
| Crucible Industries LLC | Poland | CRUCIBLE | Z-161823 | 07/05/1996 | 111737 | | | 07/05/1996 | - Metals and materials, including alloy and carbon tool steels; stainless and valve steels; nonferrous metals, including titanium, titanium alloys, nickel alloy, cobalt alloys, and intermetallics in Class 6; and consulting services in the field of metallurgy, material sciences and materials, magnetic circuit design, and software design in Class 42 | Registered |
| Crucible Industries LLC | Poland | REX 121 | Z-196134 | 12/29/1998 | 138872 | | | 02/11/2002 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Russia | CRUCIBLE | 96709893 | 07/31/1996 | 157912 | | | 10/31/1997 | - Metals and materials, including alloy and carbon tool steels; stainless and valve steels; nonferrous metals, including titanium, titanium alloys; nickel alloy, cobalt alloys, and intermetallics | Registered |
| Crucible Industries LLC | Singapore | CPM | T96/0797 2D | 07/31/1996 | T96/07972D | | | 07/31/1996 | - Steel, unwrought and semi-wrought, including steel in a powdered form | Registered |
| Crucible Industries LLC | Singapore | CPM10V | T96/0797 0H | 07/31/1996 | T96/07970H | | | 07/31/1996 | - Tool steel | Registered |
| Crucible Industries LLC | Singapore | CPM15V | T199/118 55J | 10/20/1999 | T99/11855J | | | 10/20/1999 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Singapore | CPM420V | T199/118 56I | 10/20/1999 | T99/11856I | | | 10/20/1999 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Singapore | CPM9V | T99/1185 8E | 10/20/1999 | T99/11858E | | | 10/20/1999 | - Common metals; common metals alloys; tool steel | Registered |

| Applicant | Country | Mark | Application No. | Registration No. | Date | Goods / Services | Status |
|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Singapore | CRUCIBLE | T96/0708 7E | T96/07087E | 07/12/1996 | - Metals and metallic materials: alloys; stainless and valve steels; nonferrous metals (not including alkaline and alkaline earth metals), including titanium, titanium alloys; nickel alloy, cobalt alloys | Registered |
| Crucible Industries LLC | South Africa | 10V | 96/09579 | 96/09579 | 07/15/1996 | - Common metals and their alloys, including tool steel; metal building materials; transportable buildings of metal; materials of metal for railway tracks; non-electric cables and wires of common metal; ironmongery, small items of metal hardware; pipes and tubes of metal; safes; goods of common metal not included in other classes; ores | Registered |
| Crucible Industries LLC | South Africa | 15V | 96/10807 | 96/10807 | 08/07/1996 | - Common metals and their alloys, including tool steel; metal building materials; transportable buildings of metal; materials of metal for railway tracks; non-electric cables and wires of common metal; ironmongery, small items of metal hardware; pipes and tubes of metal; safes; goods of common metal not included in other classes | Registered |
| Crucible Industries LLC | South Africa | 420V | 96/10808 | 96/10808 | 05/18/2000 | - Common metals and their alloys, including tool steel; metal building materials; transportable buildings of metal; materials of metal for railway tracks; non-electric cables and wire of common metal; ironmongery, small items of metal hardware pipes and tubes of metal; safes; goods of common metal not included in other classes; ores | Registered |
| Crucible Industries LLC | South Africa | 9V | 96/09578 | 96/09578 | 07/15/1996 | - Common metals and their alloys, including tool steel; metal building materials; transportable buildings of metal; materials of metal for railway tracks; non-electric cables and wires of common metal; ironmongery, small items of metal hardware; pipes and tubes of metal; safes; goods of common metal not included in other classes; ores | Registered |
| Crucible Industries LLC | South Africa | CPM | 96/09577 | 96/09577 | 07/15/1996 | - Powder metallurgy products | Registered |
| Crucible Industries LLC | South Africa | CRUCIBLE | 96/09283 | 96/09283 | 07/10/1996 | - Metals and materials, including alloy and carbon tool steels; stainless and valve steels; nonferrous metals, including titanium, titanium alloys; nickel alloy, cobalt alloys, and intermetallics | Registered |
| Crucible Industries LLC | Spain | CPM | 720,406 | 720,406 | 05/05/1977 | - Unwrought and partially wrought common metals and their alloys; and goods included in this class made therefrom | Registered |
| Crucible Industries LLC | Spain | CPM 15V | 1,786,430 10/26/1993 | 1,786,430 | 10/26/1993 | - Bar products and tool steel | Registered |
| Crucible Industries LLC | Spain | CRUCIBLE | 569913 09/14/1968 | 569913 | 11/14/1977 | - Unwrought and partly wrought common metals and their alloys; anchors, anvils, bells, rolled and cast building materials; rails and other metallic materials for railway tracks; chains (except driving chains for vehicles); metallic pipes and tubes; safes and cash boxes, large and portable; steel balls; horseshoes, nails and screws, other goods in non-precious metal not included in other classes; minerals | Registered |
| Crucible Industries LLC | Spain | REX | 721,598 07/24/1973 | 721,598 | 05/13/1977 | - High speed tool steel | Registered |
| Crucible Industries LLC | Switzerland | 10V | 06211/19 96 09/09/1996 | 445,988 | 08/28/1996 | - Crude and partially worked steel, particularly tool steel | Registered |

| Owner | Country | Mark | App No. | App Date | Reg No. | Reg Date | Goods/Services | Status |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | Switzerland | 15V | 06210/19 96 | 08/28/1996 | 445,987 | 08/28/1996 | - Crude and partially worked steel, particularly tool steel | Registered |
| Crucible Industries LLC | Switzerland | 420V | 06209/19 96 | 08/28/1996 | 445,986 | 08/28/1996 | - Crude and partially worked steel, particularly tool steel | Registered |
| Crucible Industries LLC | Switzerland | CPM | 06618/19 96 | 09/09/1996 | 438,941 | 08/28/1996 | - Goods of common metal; powder metallurgy products; powder metal pieces; completely shaped metal parts | Registered |
| Crucible Industries LLC | Switzerland | CRUCIBLE CPM REX | 04349/19 73 | 08/23/1973 | 269,968 | 08/23/1973 | 06 - Raw and partially machined common metals and their alloys, as well as products made thereof, namely bars, rods, plates, blocks, wires, cables, chains, fittings, screws, nails, tool steels, die steels and tool blanks | Registered |
| Crucible Industries LLC | Switzerland | REX | 0598/019 79 | 11/20/1979 | 2P-303467 | 01/24/1920 | - Tool steel | Registered |
| Crucible Industries LLC | Taiwan | 10V | 90035695 | 09/04/2001 | 1020362 | 11/01/2002 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Taiwan | CI Logo | 99010540 | 03/10/2010 | 1434585 | 10/16/2010 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Taiwan | CPM | 83044834 | 07/05/1994 | 678191 | 04/16/1995 | - Metals and alloys in powdered form | Registered |
| Crucible Industries LLC | Taiwan | CPM 1V | 88080870 | 10/15/1999 | 937607 | 04/01/2001 | - Metals and alloys, including tool steel | Registered |
| Crucible Industries LLC | Taiwan | CRUCIBLE | 83044833 | 07/05/1994 | 678190 | 04/16/1995 | - Metals, including alloys and carbon steels, non-ferrous metals, including titanium, titanium alloys, refractory metals and refractory metal alloys | Registered |
| Crucible Industries LLC | Taiwan | CRUCIBLE INDUSTRIES | 99011721 | 03/17/2010 | 1443583 | 12/16/2010 | - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip | Registered |
| Crucible Industries LLC | Thailand | 9V | 466,827 | 09/25/2001 | Kor163553 | 09/25/2001 | - Common metal, unwrought or semi-wrought; alloys of common metal; and tool steels | Registered |
| Crucible Materials Corporation | Thailand | CRUCIBLE | 321,405 | 11/06/1996 | Kor71062 | 11/06/1996 | 6 - Stainless steel; high-speed steel, tool and die steel, super alloys and titanium alloys, semi-finished products in the form of ingot, bloom, billet, bar, coil and wire, and metal pipe and tubing | Registered |
| Crucible Industries LLC | United Kingdom | CRUCIBLE CPM REX | 1013490 | 06/29/1973 | 1013490 | 06/29/1973 | 6 - Tool steel and tool steel alloys | Registered |
| Crucible Industries LLC | United Kingdom | REX | 883132 | 08/16/1965 | 883132 | 08/16/1965 | - Tool steel and tool steel alloys | Registered |
| Crucible Industries LLC | United Kingdom | S35VN | 13433801 | 11/05/2014 | 13433801 | 03/24/2015 | - Tool steel | Registered |
| Crucible Industries LLC | United States | 10V | 75/099,97 1 | 05/07/1996 | 2,108,464 | 10/28/1997 | 006 - tool steel in the form of round bars, flat bars, sheets and plates | Registered |
| Crucible Industries LLC | United States | 15V | 75/101,03 5 | 05/07/1996 | 2,108,470 | 10/28/1997 | 006 - tool steel in the form of round bars, flat bars, sheets and plates | Registered |
| Crucible Industries LLC | United States | 1V | 75/754,91 2 | 07/20/1999 | 2,456,240 | 05/29/2001 | 006 - Tool steel in the form of [ metal powder, ] round bars, flat bars, sheets, plates,[ rods, ] billets [ and blocks ] | Registered |
| Crucible Industries LLC | United States | 20CV | 86/419,19 0 | 10/09/2014 | 4,747,527 | 06/02/2015 | 006 - Tool steel in the form of metal powder, compacts, blooms, billets, rods, round bars, flat bars, sheets, and plates | Registered |

| Company | Country | Mark | Serial No. / Filing Date | Reg. No. | Reg. Date | Goods/Services | Status |
|---|---|---|---|---|---|---|---|
| CRUCIBLE INDUSTRIES LLC | United States | 3V | 75/214,52 12/17/1996 7 | 2,239,384 | 04/13/1999 | 006 - tool steel in the form of metal powder, round and flat bars, sheets and plates, rods and billets | Registered |
| Crucible Industries LLC | United States | 420V | 97/876,73 04/06/2023 0 | 7540585 | 10/22/2024 | 006 - Tool steel in the form of metal powder, compacts, blooms, rods, round bars, flat bars, sheets and plates | Registered |
| Crucible Industries LLC | United States | 4V | 85/227,67 01/27/2011 2 | 4,276,307 | 01/15/2013 | 006 - Tool steel in the form of compacts, blooms, billets, round bars, flat bars, sheets, and plates | Registered |
| Crucible Industries LLC | United States | 76 | 75/584,76 11/09/1998 7 | 2,349,641 | 05/16/2000 | 006 - tool steel in the form of round bars, flat bars, plates [, and single-point tool bits] | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | 9V | 75/101,03 05/07/1996 6 | 2,113,562 | 11/18/1997 | 006 - tool steel in the form of round bars, flat bars, sheets and plates | Registered |
| Crucible Industries LLC | United States | CI | 77/945,81 02/26/2010 9 | 4,032,296 | 09/27/2011 | 006 - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip 042 - Technical consulting services in the field of metallurgy | Registered |
| Crucible Industries LLC | United States | CPM | 72/418,21 03/13/1972 9 | 969497 | 10/02/1973 | 014 - METALS AND ALLOYS IN POWDERED FORM INCLUDING RODS, BARS, BILLETS, AND THE LIKE | Registered |
| Crucible Industries LLC | United States | CPM 10V | 73/158,20 02/09/1978 1 | 1,119,099 | 05/29/1979 | 006 - POWDER-METALLURGY, TOOL-STEEL ARTICLES | Registered |
| Crucible Industries LLC | United States | CPM 15V | 74/383,50 04/26/1993 1 | 1,889,146 | 04/11/1995 | 006 - steel in powder, sheet, rod and/or billet form | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | CPM REX 76 | 73/049,09 04/10/1975 3 | 1,043,948 | 07/20/1976 | 006 - INTERMEDIATE METAL PRODUCTS MADE FROM COMPACTED METAL POWDER-NAMELY, TOOL BITS, BILLET, BAR, AND WIRE | Registered |
| Crucible Industries LLC | United States | CRUCIBLE | 77/945,92 02/26/2010 9 | 4,035,716 | 10/04/2011 | 006 - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip 042 - Technical consulting services in the field of metallurgy | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | CRUCIBLE | 72/176,71 09/11/1963 5 | 776052 | 09/01/1964 | 014 - METALS, INCLUDING ALLOY [ AND CARBON ] STEELS [, NON-FERROUS METALS, INCLUDING TITANIUM, TITANIUM ALLOYS, REFRACTORY METALS AND REFRACTORY METAL ALLOYS, ] IN THE FORM OF BLOOMS, BILLETS, SLABS, PLATES, BARS, [ CASTINGS, ] FORGINGS, WIRE, SHEET AND STRIP | Registered |
| Crucible Industries LLC | United States | CRUCIBLE INDUSTRIES | 77/945,88 02/26/2010 4 | 4,035,715 | 10/04/2011 | 006 - Alloy and tool steels, stainless steels, and valve steels in the form of blooms, billets, slabs, plates, bars, forgings, wire, sheet, and strip 042 - Technical consulting services in the field of metallurgy | Registered |
| Crucible Industries LLC | United States | CRU-WEAR | 75/097,09 05/01/1996 3 | 2,054,997 | 04/22/1997 | 006 - wear resistant steel in the form of billet, plate, block and bar | Registered |
| Crucible Industries LLC | United States | MAGNACUT | 90/618,29 04/01/2021 7 | 6885767 | 10/25/2022 | 006 - Tool steel for making knives | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | REX | 75/801,29 09/15/1999 1 | 2,368,797 | 07/18/2000 | 006 - Tool steel in the form of metal powder, round bars, flat bars, sheets, plates, rods, billets, blooms, [ ingots, ] compacts [, and tool bits ] | Registered |
| Crucible Industries LLC | United States | REX 121 | 75/509,90 06/29/1998 1 | 2,433,895 | 03/06/2001 | 006 - tool steel in the form of round bars, flat bars and plates | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | REX 20 | 75/584,77 11/09/1998 1 | 2,370,145 | 07/25/2000 | 006 - Tool steel in the form of [ metal powder, ] round bars, flat bars, [ sheets, ] plates, [ rods, ] and billets | Registered |

| CRUCIBLE INDUSTRIES LLC | United States | REX 45 | 75/584,77 0 | 11/09/1998 | 2,370,144 | 07/25/2000 | 006 - Tool steel in the form of [ metal powder, ] round bars, [ flat bars, sheets, ] plates, [ rods, and billets ] | Registered |
|---|---|---|---|---|---|---|---|---|
| Crucible Industries LLC | United States | REX 66 | 76/542,02 9 | 09/02/2003 | 2,935,760 | 03/29/2005 | 006 - Tool steel, namely, round bars, flat bars, sheets, and plates | Registered |
| Crucible Industries LLC | United States | REX 76 | 75/101,03 0 | 05/07/1996 | 2,174,207 | 07/21/1998 | 006 - tool steel in the form of round bars, flat bars, sheets and plates | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | REX 86 | 77/556,55 4 | 08/27/2008 | 3,775,635 | 04/13/2010 | 006 - High speed steels in the form of round bars, flat bars, and plates | Registered |
| Crucible Industries LLC | United States | S110V | 77/556,62 1 | 08/27/2008 | 3,811,526 | 06/29/2010 | 006 - Tool steels in the form of [ metal powder, ] billets, [ rods, round bars, ] flat bars, plates, sheets [, and clad barrels, ] [ screws, ] [ and mill rolls ] | Registered |
| Crucible Materials Corporation | United States | S125V | 75/924,40 1 | 02/22/2000 | 2,895,995 | 10/19/2004 | 006 - Tool steel in the form of metal powder, compacts, blooms, billets, [ rods, round bars,] flat bars, sheets and plates used for knives | Registered |
| Crucible Industries LLC | United States | S30V | 75/924,16 0 | 02/22/2000 | 2,632,452 | 10/08/2002 | 006 - Tool steel in the form of metal powder, compacts, blooms, billets, rods, round bars, flat bars, sheets and plates used for knives | Registered |
| Crucible Industries LLC | United States | S35VN | 77/917,55 9 | 01/22/2010 | 4,488,716 | 02/25/2014 | 006 - Tool steel in the form of blooms, billets, flat bars, sheets, and plates | Registered |
| Crucible Industries LLC | United States | S45VN | 90/243,11 1 | 10/08/2020 | 6,809,714 | 08/02/2022 | 006 - Tool steel in the form of blooms, billets, flat bars, sheets, and plates | Registered |
| CRUCIBLE INDUSTRIES LLC | United States | S90V | 75/924,15 6 | 02/22/2000 | 2,716,077 | 05/13/2003 | 006 - Tool steel in the form of metal powder, compacts, blooms, [ billets, ] rods, round bars, flat bars, sheets and plates used for knives | Registered |
| Crucible Materials Corporation | Vietnam | CRUCIBLE | N-58697 | 02/14/1997 | 27,353 | 06/25/1998 | - Metals and materials, including alloy and carbon tool steels; stainless and valve steels; nonferrous metals, including titanium, titanium alloys; nickel alloy, cobalt alloys, and intermetallics in Class 6; permanent magnets and magnet assemblies; computer software, namely, business application and financial application software design, in Class 9; and consulting services in the field of metallurgy, material sciences and materials, magnetic circuit design, and software design, in Class 42 | Registered |

Schedule 4.10(b)

Owned Intellectual Property

None.

Schedule 4.15

Insurance Policies


See attached

CRUCIND-01    **NICKTROST**

![ACORD logo]

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**3/7/2025**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: **Nick Trost** | |
|---|---|---|
| NFP Property & Casualty Services, Inc.<br>400 West 4th Street<br>Suite 300<br>Royal Oak, MI 48067 | PHONE (A/C, No, Ext): **(313) 543-8931** | FAX (A/C, No): **(248) 594-6445** |
| | E-MAIL ADDRESS: **nick.trost@nfp.com** | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURER A : | American Casualty Company of Reading, Pennsylvania | 20427 |
| INSURER B : | Continental Casualty Company | 20443 |
| INSURER C : | Continental Insurance Company | 35289 |
| INSURER D : | North River InsuranceCompany | 21105 |
| INSURER E : | Lloyds Syndicate 1618 (Ki Digital Services Limited) | |
| INSURER F : | | |

INSURED

Crucible Industries LLC
575 State Fair Blvd.
Solvay, NY 13209-1560

COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | 7094283757 | 10/23/2024 | 10/23/2025 | EACH OCCURRENCE | $ 1,000,000 |
| | | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | | MED EXP (Any one person) | $ 15,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | OTHER: | | | | | | | $ |
| B | | AUTOMOBILE LIABILITY | | | 7094283144 | 10/23/2024 | 10/23/2025 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS ONLY   NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| C | X | UMBRELLA LIAB  X  OCCUR | | | 7094284701 | 10/23/2024 | 10/23/2025 | EACH OCCURRENCE | $ 10,000,000 |
| | | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 10,000,000 |
| | | DED  X  RETENTION $  10,000 | | | | | | | $ |
| D | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    Y/N | | | 406-740811-5 | 10/23/2024 | 10/23/2025 | X  PER STATUTE   OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **N** (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| E | | Property Limit | | | PG2406574 | 10/23/2024 | 10/23/2025 | Building/BPP | 84,186,268 |
| E | | Property Ded | | | PG2406574 | 10/23/2024 | 10/23/2025 | Building/BPP | 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Evidence of Insurance

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Crucible Industries LLC<br>575 State Fair Blvd.<br>Solvay, NY 13209-1560 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*John Miller III* |

ACORD 25 (2016/03)    © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

Schedule 5.03

Buyer Consents

None.

Schedule 6.01

Orders of Bankruptcy Court

None.

Schedule 6.01(b)(iii)

None.

21282960

**Exhibit A**

**Deposit Escrow Agreement**

49

## ESCROW AGREEMENT

This Escrow Agreement (this "**Agreement**") is made effective as of February 27 2025 ("**Effective Date**"), by and among CRUCIBLE INDUSTRIES LLC a Delaware limited liability company ("**Seller**") and LAUTER METAL TECHNOLOGIES LLC, a New York limited liability company ("**Buyer**" and together with Seller, the "**Escrow Parties**" and each an "**Escrow Party**"), and Bond, Schoeneck & King, PLLC, as escrow agent (the "**Escrow Agent**"). Capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement (as defined below).

## BACKGROUND

WHEREAS, Buyer and Seller have entered into an Asset Purchase Agreement dated as of the date hereof (the "**Purchase Agreement**"), and pursuant to Section 2.06 of the Purchase Agreement, Buyer has deposited $140,000.00 (the "**Deposit**") to an account designated by the Escrow Agent to be held and distributed in accordance with the terms of this Agreement; and

WHEREAS, Buyer and Seller have agreed to appoint the Escrow Agent to hold in escrow and distribute the Deposit pursuant to the terms of this Agreement, and the Escrow Agent has agreed to accept such appointment.

NOW, THEREFORE, in consideration of the foregoing premises, and their mutual agreements and representations contained herein, the parties hereto hereby agree as follows:

## AGREEMENT

**1.** **Appointment of Escrow Agent**. Buyer and Seller hereby appoint and designate Escrow Agent as their agent to hold in escrow, and to administer the disposition of, the Deposit pursuant to the terms of this Agreement, and Escrow Agent hereby accepts such appointment.

**2.** **Delivery of Deposit; Establishment of Escrow**. Buyer has deposited the Deposit with the Escrow Agent by wire transfer of immediately available funds to an account designated in writing by the Escrow Agent. Escrow Agent shall hold the Deposit in escrow and shall disburse the Deposit in accordance with the provisions of this Agreement.

**3.** **Deposit of Deposit**. Escrow Agent shall hold the Deposit in its non-interest bearing IOLTA account.

**4.** **Disbursement of Deposit**.

(a)     Escrow Agent shall hold the Deposit until Escrow Agent receives: (i) a joint written instruction executed by Buyer and Seller in substantially the form of Exhibit A attached hereto, with respect to any amount of the Deposit (a "**Joint Written Instruction**"), or (ii) a certified copy of a final, non-appealable judgment, order or decree of a court of competent

jurisdiction in a proceeding related to any amount of the Deposit (a "**Final Judgment**"). Escrow Agent shall have no duty to determine if a Final Judgment is non-appealable.

(b)     Within two (2) business days after Escrow Agent's receipt of a Joint Written Instruction or a Final Judgment, Escrow Agent will pay the amount specified in such Joint Written Instruction or Final Judgment (or, if such amount is greater than the then-remaining Deposit, the balance of the Deposit) to the designated party in immediately available funds in accordance with the payment instructions set forth in such Joint Written Instruction or Final Judgment.

5.     **Termination**. Except as otherwise provided herein, this Agreement shall automatically terminate upon the date of disbursement of the entire Deposit.

6.     **Escrow Agent's Duties and Fees**.

(a)     **Duties Limited**. Escrow Agent undertakes to perform only such duties as are expressly set forth herein and will not be subject to, nor have any liability or responsibility under, nor be obligated to recognize, the Purchase Agreement or any other agreement between, or directions or instructions from Buyer, Seller, or any other person or entity in carrying out its duties hereunder, except for any notices or other documents delivered to Escrow Agent in accordance with the terms of this Agreement. Escrow Agent will not charge a fee for its services as Escrow Agent. Upon the earlier to occur of the following, Escrow Agent shall be relieved of any and all further obligations hereunder: (i) the termination of this Agreement in accordance with the terms hereof; or (ii) the delivery of all of the Deposit by Escrow Agent to a successor Escrow Agent or a court of competent jurisdiction, in accordance with the terms hereof.

(b)     **Acknowledgement of Dual Capacity of Escrow Agent**. Buyer and Seller acknowledge that along with dutifully fulfilling the duties of Escrow Agent as set forth herein, Escrow Agent is also the attorney for Seller. Buyer agrees that at no time shall Escrow Agent be expected to subordinate its legal representation of Seller to the role and duties of Escrow Agent, and Buyer hereby waives any and all conflicts that may arise from the dual capacity of Escrow Agent as attorney for Seller and as Escrow Agent under this Agreement.

(c)     **Reliance**. Escrow Agent may rely upon, and will be protected in acting or refraining from acting upon, any written notice, instruction, or request furnished to it hereunder and reasonably believed by it to be genuine and to have been signed or presented by Buyer or Seller. Buyer and Seller shall deliver to the Escrow Agent a list of authorized signatories, as set forth in the Schedule 1-A attached hereto, with respect to any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder, and the Escrow Agent shall be entitled to rely on such list with respect to any party until a new list is furnished by such party to the Escrow Agent. Furthermore, in the event funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by fax or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule 1-A hereto, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The persons and telephone numbers designated for such call-backs may be changed only in a writing received by the Escrow Agent.

(d)     Escrow Agent may act in reliance upon the reasonable advice of counsel reasonably satisfactory to it retained by Escrow Agent in reference to any matter connected with its obligations hereunder and will not incur any liability for any action taken in good faith in accordance with such advice.

(e)     **Standard of Care; Indemnification.** Escrow Agent will not be responsible for any act or failure to act hereunder except in the case of its gross negligence or willful misconduct. Buyer and Seller will jointly and severally indemnify, defend and hold Escrow Agent harmless from and against any claims, damages, losses, liabilities, costs and expenses (including without limitation reasonable attorneys' fees and court costs) that arise out of or in connection with this Agreement or the performance by Escrow Agent of its obligations hereunder; provided that Buyer and Seller will have no obligation to indemnify Escrow Agent to the extent that any of such claims, damages, losses, liabilities, costs or expenses arise out of the gross negligence or willful misconduct of Escrow Agent. This section shall survive notwithstanding the termination of this Agreement or the resignation or removal of Escrow Agent.

(f)     **Limitation of Liability; Force Majeure.** Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action, nor shall Escrow Agent be liable for acts of nature, acts of war, labor difficulties, actions of public authorities, or any other similar cause or catastrophe beyond Escrow Agent's reasonable control.

(g)     **Compliance with Court Order.** If all or any part of the Deposit is attached, garnished or levied upon under any order of court, or if the delivery thereof is stayed or enjoined by any order of court, or if any other order, judgment or decree is made or entered by any court of competent jurisdiction (from which no appeal may timely be taken) which affects the Deposit or any part thereof, Escrow Agent is expressly authorized in its sole reasonable discretion to comply with all final writs, orders, judgments or decrees so entered or issued, whether with or without jurisdiction, and Escrow Agent will not be liable to Buyer or Seller by reason of such compliance.

(h)     **Disputes.** Should any dispute arise with respect to this Agreement or the Deposit, whether such dispute arises between Buyer, Seller and others, or between Buyer and Seller themselves, it is understood and agreed that Escrow Agent may (i) petition (by means of an interpleader or any other appropriate measure) any court of competent jurisdiction for instructions with respect to such dispute or (ii) deposit the Deposit with any court of competent jurisdiction and thenceforth be relieved of any duty or responsibility hereunder. Should Escrow Agent undertake any of the aforesaid actions, Buyer and Seller will indemnify, defend and hold Escrow Agent harmless against all consequences and expenses that may be incurred by Escrow Agent in connection therewith, which indemnity shall survive the termination of this Agreement or the resignation or removal of Escrow Agent.

(i)     **Successor Escrow Agent.** Escrow Agent may resign by giving written notice of such resignation to Buyer and Seller, specifying the date upon which such resignation is

to take effect (not less than thirty (30) days after giving such notice) and thereafter Escrow Agent shall have no further obligation to Buyer or Seller, except to hold the Deposit as depository. Buyer and Seller, acting together, shall have the right to terminate the appointment of Escrow Agent hereunder by providing written notice to Escrow Agent of such termination, specifying the date upon which such termination is to take effect. Thereafter, Escrow Agent shall have no further obligation to Buyer or Seller except to hold the Deposit as depository. Upon any such resignation or termination of Escrow Agent, (i) Buyer and Seller agree that they will jointly appoint a banking corporation, trust company or attorney as successor escrow agent, (ii) Escrow Agent shall refrain from taking any action until it shall receive Joint Written Instructions from Buyer and Seller designating the successor escrow agent, (iii) Escrow Agent will deliver all of the then-remaining balance of the Deposit to the successor escrow agent in accordance with such Joint Written Instructions, whereupon Escrow Agent will have no further obligations hereunder and (iv) the successor escrow agent will have all rights of an Escrow Agent hereunder and will be bound by all of the provisions of this Agreement.

(j)     **Conflicts**. In the event that Escrow Agent shall be uncertain as to its duties or rights under this Agreement, or shall receive any certificate, statement, request, notice, advice, instruction, direction or other agreement or instrument from any other party with respect to the Deposit which, in Escrow Agent's reasonable and good faith opinion, is in conflict with any of the provisions of this Agreement, or shall be advised in writing that a dispute has arisen with respect to the Deposit or any part thereof, Escrow Agent shall be entitled, without liability to any person, to refrain from taking any action other than to keep safely the Deposit until Escrow Agent shall be directed otherwise in accordance with Joint Written Instruction or by a Final Judgment.

7.     **Notices**. Unless otherwise specifically provided herein, all notices, consents, requests, demands and other communications required or permitted hereunder: (a) will be in writing; (b) will be sent by messenger, certified or registered U.S. mail, or by a reliable express delivery service, charges prepaid as applicable, to the appropriate address(es) set forth below; and (c) will be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by a receipt executed by the addressee (or a responsible person in his or her office), the records of the person delivering such communication or a notice to the effect that such addressee refused to claim or accept such communication. All such communications will be sent to the following addresses, or to such other addresses as any party may inform the others by giving five business days' prior notice:

If to Seller to:
    Crucible Industries LLC
    575 State Fair Blvd.
    Solvay, New York 13209
    Email: john.shiesley@crucible.com
    Attention: John Shiesley, President

If to Buyer to:

    LAUTER METAL TECHNOLOGIES LLC

{9782938:5 }4

1B Powell Lane
Penn Yan, NY 14604
Email: ross@optitorque.com
Attention: Ross Castner, Director of Operations

If to Escrow Agent to:

Bond, Schoeneck, & King PLLC
One Lincoln Center, 18th Floor
110 West Fayette Street
Syracuse, New York 13202
Email: sullivc@bsk.com
Attention: Charles Sullivan

**8. Miscellaneous**. This Agreement: (a) may be amended only by a writing signed by each of the parties hereto, (b) may not be assigned, pledged or otherwise transferred by any party, whether by operation of law or otherwise, without the prior consent of the other parties, (c) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument, and delivery of an executed counterpart by .pdf or other electronic means shall be equally effective as delivery of an original, manually executed counterpart of this Agreement, (d) contains the entire agreement of the parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions, and (e) is binding upon, and will inure to the benefit of, the parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns. The due performance or observance by a party of any of its obligations under this Agreement may be waived only by a writing signed by the party against whom enforcement of such waiver is sought, and any such waiver will be effective only to the extent specifically set forth in such writing. The waiver by a party of any breach or violation of any provision of this Agreement will not operate as, or be construed to be, a waiver of any subsequent breach or violation hereof. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. This Agreement shall be governed by, construed and enforced in accordance with the internal laws (both substantive and procedural) of the State of New York, without giving effect to any conflicts of law principles. All actions among the Escrow Parties arising out of or relating to this Agreement shall be heard and determined exclusively in state court located in Onondaga County, New York. Consistent with the preceding sentence, the Escrow Parties hereby (A) submit to the exclusive jurisdiction of state court sitting in Onondaga County, New York for the purpose of any action arising out of or relating to this Agreement brought by any party hereto and (B) irrevocably waive, and agree not to assert by way of motion, defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that the action is brought in an inconvenient forum, that the venue of the action is improper or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above-named courts.

**9.** **Section Headings.** The section headings contained in this Agreement are inserted for purposes of convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

**10.** **No Presumption against Drafting Party.** The parties hereto acknowledge that each has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first written above.

**SELLER:**                                        CRUCIBLE INDUSTRIES LLC


                                                   By:                            _____
                                                   Name:
                                                   Title:

**BUYER:**                                         LAUTER METAL TECHNOLOGIES LLC


                                                   By: _____
                                                   Name:
                                                   Title:

**ESCROW AGENT:**                                  BOND SCHOENECK & KING, PLLC


                                                   By: _____
                                                   Name:
                                                   Title:

## EXHIBIT A

## FORM OF ESCROW RELEASE NOTICE – JOINT WRITTEN INSTRUCTIONS

[Date]

Bond, Schoeneck & King PLLC
One Lincoln Center, 18th Floor
110 West Fayette Street
Syracuse, New York 13202
Attention: Charles Sullivan
sullivc@bsk.com

Re: Crucible Industries LLC ("**Seller**"), and Lauter Metal Technologies LLC ("**Buyer**") –
Escrow Agreement dated
[• ]
Escrow Account no. [•]

Dear Charlie:

We refer to an escrow agreement dated as of February 27, 2025 among Seller and Buyer, and
Bond, Schoeneck & King, PLLC, as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given
to them in the Escrow Agreement.

Pursuant to Section 4 of the Escrow Agreement, Buyer and Seller hereby direct Escrow Agent to
release the Deposit, or the portion specified below, to the specified party as instructed below.

Amount:
(In writing)
Beneficiary:
City:
Country:

**US Instructions:**
Bank Name:
Bank Address:
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:
    FFC A/C Name:
    FFC A/C #:
    FFC A/C Address:

**International Instructions:**
Bank Name:
Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:
Credit A/C # (IBAN #):
Credit A/C Address:
If Applicable:
  FFC A/C Name:
  FFC A/C # (IBAN #):
  FFC A/C Address:

**SELLER:**

CRUCIBLE INDUSTRIES LLC


By: _____
Name:
Title:


**BUYER:**

LAUTER METAL TECHNOLOGIES LLC


By: _____
Name:
Title:

## SCHEDULE 1-A

## DESIGNATION OF AUTHORIZED REPRESENTATIVES

The Escrow Agent is authorized to accept instructions signed or believed by the Escrow Agent to be signed by the following 'on behalf of Seller:

| Michael Freer | | |
|---|---|---|
| Name | True Signature | Phone Number |
| John Shiesley | | |
| Name | True Signature | Phone Number |

The Escrow Agent is authorized to accept instructions signed or believed by the Escrow Agent to be signed by the following on behalf of Buyer:

| | | |
|---|---|---|
| Name | True Signature | Phone Number |
| Ross Castner | | |
| Name | True Signature | Phone Number |

## Exhibit B

Bill of Sale

## BILL OF SALE

THIS BILL OF SALE, (this "**Agreement**"), dated [•], is entered into by CRUCIBLE INDUSTRIES LLC a Delaware limited liability company ("**Seller**") in favor Lauter Metal Technologies LLC, a New York limited liability company ("**Buyer**").

## BACKGROUND

Pursuant to that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated February 27, 2025, by and between Seller and Buyer, and subject to its terms in all respects, Seller desires to sell, assign and transfer the Tangible Personal Property to Buyer and Buyer desires to accept the transfer thereof from Seller.

## AGREEMENT

**1.** **Definitions**. All capitalized words and terms used in this Agreement and not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

**2.** **Conveyance of Tangible Personal Property**. Seller hereby sells, transfers, conveys, and delivers to Buyer, effective as of the date hereof, all of Seller's rights, title and interests in and to the Tangible Personal Property.

**3.** **Relation to Purchase Agreement**. This Agreement is subject in all respects to the terms and conditions of the Purchase Agreement, and nothing contained herein is intended or shall be deemed to supersede, amend, enlarge, diminish, or rescind any of the obligations, agreements, covenants, or warranties of any party contained in the Purchase Agreement. In the event of any inconsistency between the terms of the Purchase Agreement and this Agreement, the terms of the Purchase Agreement shall govern and control.

**4.** **Binding Effect**. This Agreement and the various rights and obligations arising hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**5.** **Miscellaneous**. This Agreement is not intended to, and does not, create any third party beneficiary rights in any Person.

[SIGNATURE PAGE FOLLOWS]

## [SIGNATURE PAGE TO BILL OF SALE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**SELLER:**

CRUCIBLE INDUSTRIES LLC

By:_____

Name:

Title:

## Exhibit C

Assignment & Assumption

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Assignment**"), dated [•], is entered into by and between CRUCIBLE INDUSTRIES LLC a Delaware limited liability company ("**Seller**") and LAUTER METAL TECHNOLOGIES LLC, a New York limited liability company ("**Buyer**").

### BACKGROUND

**WHEREAS**, Buyer and Seller have entered into that certain Asset Purchase Agreement dated February 13, 2025 (the "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to sell and assign all of its rights, title and interests in and to the Purchased Assets (such Purchased Assets other than the tangible personal property included in the Purchased Assets, the "**Assigned Assets**") to Buyer and Buyer has agreed to assume the Assumed Liabilities.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

**1.    Definitions**. All capitalized words and terms used in this Assignment and not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

**2.    Assignment**. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the Assigned Assets.

**3.    Acceptance of Assignment and Assumption of Assumed Liabilities**. Buyer hereby accepts such assignment and assumes the Assumed Liabilities. The parties acknowledge and agree that this Assignment does not transfer, and the Buyer does not assume, any of the Excluded Liabilities.

**4.    Relation to Purchase Agreement**. This Assignment is subject in all respects to the terms and conditions of the Purchase Agreement, and nothing contained herein is intended or shall be deemed to supersede, amend, enlarge, diminish, or rescind any of the obligations, agreements, covenants, or warranties of any party contained in the Purchase Agreement. In the event of any inconsistency between the terms of the Purchase Agreement and this Agreement, the terms of the Purchase Agreement shall govern and control.

**5.    Binding Effect**. This Assignment and the various rights and obligations arising hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**6.**     **Miscellaneous**. This Assignment (a) may not be amended, supplemented or modified except in writing signed by both parties; (b) may be executed and delivered by facsimile or other electronic means and in one or more counterparts, all of which, when executedand delivered, shall constitute one and the same instrument; and (c) is not intended to, and does not, create any third party beneficiary rights in any Person.

[SIGNATURE PAGE FOLLOWS]

[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed as of the date first above written.

**SELLER:**

CRUCIBLE INDUSTRIES LLC

By:_____
Name:
Title:

**BUYER:**

LAUTER METAL TECHNOLOGIES LLC

By:_____
Name:
Title: